**STATE of Missouri, Respondent,**

v.

**Kim L. DAVIS, Appellant.**

**No. WD 60762.**

Missouri Court of Appeals,
Western District.

April 1, 2003.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 27, 2003.

Application for Transfer Denied
July 1, 2003.

412

Raymund Jared Capelovitch, Appellate Defender, Nancy L. Vincent, Asst. Public Defender, St. Louis, MO, for Appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Breck K. Burgess, Asst. Attorney General, Jefferson City, MO, for Respondent.

Before RONALD R. HOLLIGER, P.J., PAUL M. SPINDEN, and JAMES M. SMART, JR., JJ.

JAMES M. SMART, JR., Judge.

Kim L. Davis appeals his conviction of first degree murder in the vehicular dragging death of Jake Robel. He challenges the sufficiency of the evidence, and also trial court rulings on photographic exhibits, motion for change of venue, and motion for mistrial. We affirm the conviction.

In February, 2000, Davis was being held in Carroll County, Missouri, after conviction of municipal charges in Independence, Missouri. At the time, Independence had a contract with Carroll County to hold prisoners. On the morning of February

22, 2000, Davis was released from the jail and upon leaving saw Officer Kormendi, an Independence police officer, outside the jail. Kormendi had just dropped off a prisoner, and Davis asked him if he could give him a ride back to Independence. Kormendi agreed, as it was common practice to give released prisoners a courtesy ride back to Independence.

Kormendi left Davis at the intersection of 291 Highway and 23rd Street before Kormendi proceeded on to the Independence police station. Shops with restrooms and phones were located at the intersection. Davis left the intersection and began walking south.

Davis came to the intersection of 291 Highway and Hidden Valley Road. At the intersection was a strip mall. Davis went into a restaurant in the strip mall, Bogart's, at around 2:30 p.m. and called his sister on the pay phone. She agreed to come and pick him up at the strip mall, but told him that it would be awhile before she would be there. Davis went outside to wait for his sister between 3:30 p.m. and 4:00 p.m. Once outside, Davis waited in front of Mr. Goodcents, a sandwich shop in the strip mall.

Around 4:00 p.m., Christy Robel ("Robel") drove up to the strip mall in her Chevrolet Blazer and parked in front of Mr. Goodcents. Her six-year-old son, Jake, was riding in the back seat on the driver's side. Because the day was warm, he had rolled down the back window. He was wearing his seat belt, which consisted of a connected lap and shoulder harness. The lap section of the seat belt was properly across Jake's lap, but he had moved the shoulder section behind his back.

Robel turned off the Blazer, but did not remove the keys from the ignition. She spoke with Jake about getting food at Mr. Goodcents. Jake decided that he wanted to stay in the car, so Robel went into the restaurant alone. As soon as she entered the store and began to place her order at the counter, another customer, Nick Barela, saw Davis climb into the Blazer. Barela yelled at Robel that someone was stealing her car. Robel and Barela ran out of the store toward the Blazer.

Robel ran to the back driver's side door and tried to free Jake. Davis began to back up the Blazer. Barela attempted to reach into the Blazer and grab Davis, but just brushed his shirt. Robel had trouble getting Jake's seatbelt to release. She frantically yelled at Davis for him to stop so that she could get her son out of the car. Davis told her to get away from the car. Jake was screaming.

Robel unlatched the seatbelt and pulled Jake from the Blazer, but the seatbelt was still wrapped around his waist. Davis stopped backing up the car and started driving forward. Robel and Jake fell. Davis drove the Blazer forward and dragged Jake and Robel for a short distance. Robel lost her grip on Jake. Davis continued to drive forward, with the back door open and with Jake being dragged. Jake screamed for his mother to help him. The back door slammed shut, locking Jake outside the car, tangled in the seat belt. The back window was still down. Barela yelled at Davis to "Stop and let the child off." Robel screamed repeatedly at Davis that he was dragging her son. Several people heard Robel screaming, including some behind closed doors. A lady 640 feet away clearly heard Robel's screams.

As Davis was driving forward, Barela, Robel, and another witness saw Davis look to his back and left, toward where Jake was being dragged. Davis also looked in the rear-view mirror on the driver's side door. The Blazer was equipped with a convex mirror on the door's rear-view mirror that widened the field of view and

allowed the driver to see in "blind spots." Davis drove out of the parking lot and onto 291 highway. Jake was still screaming. Robel, Barela, and other witnesses to the event ran after the Blazer, screaming at Davis to stop and that he was dragging a child.

Davis drove south on 291 Highway. After he drove about thirty feet down the highway, he looked back again, in the direction of where Jake was now being dragged and now bouncing against the side of the Blazer. Davis drove the Blazer over a concrete median. Jake slammed into the median, which caused him to bounce up as high as the top of the back window. Several people saw that Davis was dragging Jake and began honking their horns or flashing their lights. Davis did not stop but drove down the highway at a high rate of speed. Two more witnesses further down the highway observed Davis looking in the direction of Jake.

Davis turned onto Interstate 70, and began driving even faster, over 80 miles per hour. Jake's body was spinning and twisting, slamming into the side of the Blazer. At times, Jake's body was bouncing as high as the middle of the back windows. Several motorists noticed Jake and began flashing their lights and honking their horns. Davis, again, was seen looking into the door rear view mirror in the direction of Jake. Several horrified motorists began chasing the Blazer.

Davis exited at Noland Road. Davis jumped curbs on Noland Road and drove erratically around other motorists. Witnesses could hear Jake being dragged and bounced off the Blazer, as well as visually observe him. Davis came to the intersection of Noland Road and Lynn Court. The traffic in the intersection was heavy, with cars crossing the intersection, blocking off Noland Road. Davis was forced to stop to avoid the traffic. People that had been chasing Davis from I–70 caught up with him. Howard Byam and Frank Byam, brothers, pulled their Chevrolet Silverado truck in front of the Blazer. Davis got out of the Blazer and looked at Jake's body. Davis stated, "I didn't do that," and reentered the Blazer. He then rammed the Byams' truck. Other cars pulled in behind Davis. Davis then began ramming the vehicles that were blocking him in, attempting to escape. Jake still hung from the Blazer.

The Byam brothers wrestled Davis out of the Blazer. Davis resisted, and the Byams restrained Davis until the police arrived. The total distance between where the strip mall and where Davis was apprehended was about four and a half miles. Jake was pronounced dead on the scene. He had suffered numerous cuts and abrasions over his extremities, but died from blunt force trauma to his head. At 4:30, Davis' sister arrived at Mr. Goodcents to pick him up.

Davis was charged with murder in the first degree, kidnapping, tampering in the first degree, and armed criminal action. A jury trial was held. The State called nineteen eyewitnesses to the crime, many of whom observed Davis looking in the direction of Jake while he was driving the Blazer. The State called a medical examiner to discuss Jake's wounds and how they were inflicted. The medical examiner testified that Jake was alive, if not conscious, when most of the wounds were inflicted, and, thus, was probably alive for most of the ordeal. The State also called crime scene investigators, which had done experiments to determine whether Davis could have seen Jake from the Blazer's rear view mirrors. The investigators testified they determined that Davis could have observed Jake from the rear view mirrors.

The defense called two witnesses: Officer Kormendi and Stuart Nightenhelser, a

specialist in accident reconstruction. Nightenhelser testified about how a convex mirror works, but did not make any comment as to whether, in this circumstance, Davis could or could not have seen Jake from the convex or regular rear view mirrors on the Blazer. The jury found Davis guilty on all charges. The option of death was presented to the jury. The recommendation of the jury was for life imprisonment. Davis was sentenced as a prior and persistent offender to consecutive terms of life without eligibility for probation or parole for murder in the first degree, life imprisonment for armed criminal action, seven years for tampering in the first degree, and fifteen years for kidnapping. Davis now appeals.

### Change of Venue Motion

Davis claims that the trial court abused its discretion in denying his motion for a change of venue to the City of St. Louis.[1] Davis states that he was unable to receive a fair trial because, as a result of extensive media coverage, there was a huge wave of public passion and bitter prejudice against him in Jackson County, where the trial was held.

Davis filed his motion for change of venue on April 4, 2001, over a year after his initial arraignment. The motion alleged that:

> The circumstances of this case involve a high profile criminal investigation, which has been extensively reported by print, radio and television media. This media coverage has been pervasive. The coverage has not been limited to coverage of information in the public record. The coverage has resulted in prejudicing the inhabitants of Jackson County and the surrounding counties which share the same media outlets.

The motion also alleged:

> The Accused believes that St. Louis is the only venue in the State of Missouri where an impartial jury can be chosen that reflects a potential jury pool composed of a mix of ethnic and socioeconomic backgrounds similar to Jackson County. The Accused is an African-American male who is charged in the death of a white child in the suburbs of Kansas City. The defense can not ignore the possibility that race could influence the views of some potential jurors in this case.

The motion stated, "If the court denies a change of venue to the City of St. Louis the defense intends to withdraw this motion for a change of venue."

■ Initially, this court notes that the motion was deficient on three procedural grounds. First, the motion was filed out of time. Rule 32.04(b) states: "In felony and misdemeanor cases the application [for change of venue] must be filed not later than ten days after the initial plea is entered." Here, the motion was filed over a year after arraignment and less than two months before trial was scheduled to begin. Under such circumstances, this court will review for plain error only and will reverse only for manifest injustice. *State v. Leisure*, 749 S.W.2d 366, 376 (Mo. banc 1988) (motion for change of venue filed two years after arraignment failed to preserve issue and was reviewable for plain error only).

■ Second, this court notes that Davis was requesting only a change of venue to the City of St. Louis. Davis stated that if the trial court intended to order a change

---

1. In the same motion, Davis alternately requested that a jury be chosen from the City of St. Louis and sent to Jackson County for the trial. The trial court denied this motion. Davis does not challenge this issue on appeal.

of venue elsewhere, Davis would prefer that the trial be held in Jackson County. There is no provision that allows a defendant to have the luxury of deciding where, outside of where the crime was committed, his trial is to be held. Davis stated that he believed that St. Louis, because it is "composed of a mix of ethnic and socioeconomic backgrounds similar to Jackson County" and because of his race as an African–American, was the only place he would be able to receive a fair trial.

■ Statistical disparities of African–American populations in two counties are irrelevant for purposes of change of venue. *See State v. Brooks*, 960 S.W.2d 479, 487 (Mo. banc 1997). The defendant is not entitled to a jury composed of any particular racial composition. U.S. CONST. amend. XIV; *Mallett v. State*, 769 S.W.2d 77, 80 (Mo. banc 1989), *cert. denied* 494 U.S. 1009, 110 S.Ct. 1308, 108 L.Ed.2d 484 (1989). Accordingly, Davis' motion for a change only to St. Louis was not well-supported in law.

■ The third procedural aspect of his motion that was deficient relates to the affidavit requirement. There is no evidence that Davis filed an affidavit and the "affidavits of at least two credible disinterested citizens of [Jackson County] where said cause is pending" in support of his motion, as is required by section 545.490, RSMo.2000.

■ In cases such as this, however, where it is possible that pretrial publicity may have precluded the possibility for Davis to receive a fair trial, we will review the record for plain error to determine if there has been a manifest injustice or a miscarriage of justice. *Rule 30.20; Leisure*, 749 S.W.2d at 376. The trial court held a hearing to determine whether to grant the motion for change of venue. No audio or visual recordings of the media coverage or copies of the print media coverage were entered into evidence. The only evidence provided to the trial court consisted of the testimony of Dr. Donald Granburg, a sociologist from the University of Missouri–Columbia.

Granburg testified as to the results of a poll he conducted in the summer of 2000. The sample size was 397 people out of over 680,000 residents of Jackson County. It was not determined whether or not the respondents were eligible to serve on a jury. The results of the poll showed that 95% of those polled had heard something about the case. Sixty-eight percent knew that someone had been arrested, but only 7% knew Davis' name. Granburg testified that one question he asked was the following:

> What is your opinion about the probable guilt or innocence of Kim Davis? Would you say he is definitely guilty, probably guilty, probably not guilty or definitely not guilty?

Seventy-nine percent of those polled responded that he was definitely guilty and no one thought he was definitely not guilty.

While Davis makes much of this statistic, it is misleading. First, the question is not clear. Asking whether Davis was guilty does not specify what offense the respondent thinks, subjectively, Davis is guilty of. The question could refer to murder. The question could refer to whether the person thinks Davis stole the Blazer. In contrast, compare the answers to the following question, which was also asked by Granburg:

> Kim Davis has been charged with murder in the first degree for the death of Jake Robel. Murder in the first degree is acting with deliberation.... What is your opinion of the guilt or innocence of Kim Davis? Would you say he is definitely guilty of first-degree

murder, probably guilty of first-degree murder, probably not guilty of first-degree murder or definitely not guilty of first-degree murder?

In response to that question, the number of people responding that Davis was definitely guilty dropped to 43% (one-half of those responding affirmatively to the first question). Six percent responded that he was definitely not guilty. The respondents to the poll were not given an explanation of the phrase "acting with deliberation" and were not provided other legal instructions or definitions. None of the respondents were asked whether, if they were asked to serve on a jury, they could set aside their opinions and decide the case based on the evidence that was presented at trial. No evidence was provided to the court pertaining to why St. Louis was a proper venue.

After reviewing the evidence, the trial court denied the change of venue:

I'm not persuaded by what I have read and what I have heard and in the motions that the defendant cannot get a fair trial here in Jackson County.

In fact, after having read all of this and listened to this I'm rather swayed by the fact that I think he can. I think his rights are in good hands with the citizens of this county.

I don't have any evidence before me that, in fact, the City of St. Louis offers a fair venue for him.

Considering the evidence before the trial court, its ruling was not arbitrary or unreasonable. The burden of proof is on the defendant to show that the inhabitants of the county are prejudiced against him. § 545.490, RSMo.2000; *Rule 32.04(a)(1)*. Davis did not meet his burden. The only evidence presented was the poll evidence. The poll did show that many residents of Jackson County were aware of the case, and many had an opinion that Davis was

definitely guilty. There was no evidence, however, that any of the jurors who actually served possessed a fixed opinion of his guilt.

The fact that so many potential jurors may have heard of the case does not alone mandate a change of venue. *State v. Deck*, 994 S.W.2d 527, 533 (Mo. banc 1999)(69% of county residents exposed to publicity not grounds for change of venue); *State v. Johns*, 34 S.W.3d 93, 107–08 (Mo. banc 2000) (over 80% of potential jurors exposed to publicity not grounds for change of venue); *State v. Baumruk*, 85 S.W.3d 644 (Mo. banc 2002) (80% of potential jurors state that defendant is "definitely guilty" not necessarily grounds for change of venue; venue changed on other grounds). It is not required that the jurors be totally ignorant of the facts and issues involved. *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The question is not whether the community remembers the case, but rather whether the actual jurors of the case have such fixed opinions that a fair trial is impossible. *State v. Feltrop*, 803 S.W.2d 1, 6 (Mo. banc 1991). There is no evidence that any juror in this case had such fixed opinions.

Well over one hundred people were called to the venire panel. After the venire panel was sworn, the trial court gave a lengthy speech to the panel concerning the media publicity around this case. The court asked numerous questions of the panel concerning what they had heard, though the court did not allow them to state specifically in front of other jurors what they had heard (in order to prevent jury contamination). The court took many hours for a thorough and careful jury selection process. The court excused the venirepersons that affirmatively stated that they had already made up their minds or could not be fair or impartial. Half of

the jury was composed of African–Americans. Davis does not show that anyone who served on the jury had been affected by the media accounts in such a way as to cast doubt on the objectivity of the jury. Davis also cannot show that anyone on the jury was biased against him for any reason.

This case did not center on the issue of identity. There was no question that Davis was driving the Blazer. Rather, at issue in this case was whether Davis was guilty of knowingly, with deliberation, dragging Jake Robel. There is no evidence that the media coverage ever addressed this issue or that any of the jury members had a fixed preconception that would have prevented their open-minded consideration of whether Davis was guilty of deliberation in the dragging death of Jake Robel. We find no indication of error in the ruling of the trial court.

For all the forgoing reasons, this point is denied.

### Motion for Mistrial

 In his second point on appeal, Davis argues that the trial court erred in denying Davis' Motion for a Mistrial. Davis claims that juror misconduct occurred which denied him the right to a fair trial.

During voir dire, Venireperson Boyce approached the bench, out the hearing of the venire panel, and informed the judge and attorneys that her grandchild attended school with Davis' biological daughter. Davis' biological daughter had been adopted into another family. Venireperson Boyce stated that she could be fair and impartial. Neither the State nor the defense struck Venireperson Boyce, and she became a member of the jury.

During the guilt phase jury deliberations, the jury foreman notified the Bailiff that jurors (but not Juror Boyce) had expressed concerned about the well being of Juror Boyce's grandchild in case a certain verdict was reached in the case. The Bailiff brought the matter to the judge's attention. At that time, the defense asked for a mistrial based on the fact that the jurors were considering evidence outside what was submitted in court. The judge decided to consider the motion, but he did not rule. The Judge reviewed the transcript of voir dire to determine whether Juror Boyce was properly on the jury. He determined that there was nothing in the voir dire that disqualified her from service.

While the matter was still being considered, the jury returned with its verdicts. After a short recess, the judge decided to question the jury on the matter. Both the State and defense objected to any questions. Juror Boyce admitted that she made a comment concerning her grandchild when some of the jurors expressed concerns about safety in the community. She stated that the matter of her grandchild had not been on her mind during the trial, but only when other jury members expressed safety concerns. The jurors stated, however, that the safety concerns had . no effect on their deliberations or verdicts. The juror who brought the matter to the attention of the Bailiff stated that their concern was with whether the judge and attorneys were aware of Juror Boyce's tenuous connection with Davis.

The judge determined that the jurors had not been pressured into reaching their verdicts. The judge denied Davis' motion for mistrial.

 Davis argues that a mistrial should have been granted. Mistrial is a drastic remedy, which should only be employed in the most extraordinary of circumstances. *State v. Clemons*, 946 S.W.2d 206, 217 (Mo. banc 1997). "The decision whether to grant a mistrial is left primari-

ly to the trial court, which is in the best position to determine whether the complained-of incident had any prejudicial effect on the jury." *State v. Smith,* 32 S.W.3d 532, 552 (Mo. banc 2000). "A trial court's decisions concerning juror misconduct will not be disturbed unless there is abuse of discretion." *State v. Brown,* 998 S.W.2d 531, 540 (Mo. banc 1999). "The trial court abuses its discretion when its ruling is clearly against logic of circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Id.* "If reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." *Id.*

 Juror misconduct during a felony trial requires reversal for a new trial, unless the State affirmatively shows that the jurors were not subjected to improper influences as a result of the misconduct. *State v. Smith,* 944 S.W.2d 901, 921 (Mo. banc 1997), *cert. denied,* 522 U.S. 954, 118 S.Ct. 377, 139 L.Ed.2d 294 (1997); *State v. Brown,* 939 S.W.2d 882, 883 (Mo. banc 1997). A new trial is required only if the defendant was prejudiced by that misconduct. Here, the Judge questioned the jury concerning the matter. The jurors testified that they had performed their duties without fear and that their verdicts were based on the evidence submitted. The judge found that Juror Boyce's statements had not influenced the jurors:

> I don't find that her few little remarks in any way pressured her into the verdict. There is absolutely no evidence to support that. In fact, there are indications to the contrary.... I don't find from my view of the jury that, in fact, this is much more than a tempest in a teapot....

Of course, jurors might consider the reaction of the community in a high-profile case. That does not mean, however, that they allow such consideration to influence their verdict. Considering the statements of the jurors and the verdicts, there is no evidence here that the jury's deliberations were affected. The trial court did not abuse its discretion in denying the motion for mistrial.

**Sufficiency of Evidence of Deliberation**

 In his third point on appeal, Davis argues that the trial court erred in denying his motion for acquittal at the close of the evidence. Davis claims that the evidence adduced by the State was insufficient to support a conviction for murder in the first degree because the evidence did not demonstrate that Davis deliberated upon murdering the victim. Davis does not assert that his convictions for armed criminal action, tampering in the first degree, or kidnapping were not supported by the evidence.

Davis was convicted of murder in the first degree under section 565.020, RSMo. 2000: "A person commits the crime of murder in the first degree if he knowingly causes the death of another person after deliberation upon the matter." Davis concedes that the State's evidence clearly established that he intended to steal the Blazer, but argues that the evidence fails to prove that Davis was aware Jake was tangled in the seat belt when he drove away. Davis argues that the evidence, taken as a whole, demonstrates a lack of deliberation.

 Deliberation is defined as "cool reflection for any length of time no matter how brief." § 565.002(3), RSMo.2000. It is not necessary that the actor brood over his actions for an appreciable period of time. *Feltrop,* 803 S.W.2d at 11. Deliberation may be implied from the circumstances

surrounding the incident, especially when there is a prolonged attack. *State v. Ervin,* 979 S.W.2d 149, 159 (Mo. banc 1998).

The State has the burden of proving all the elements of the crime. *State v. Clay,* 975 S.W.2d 121, 139 (Mo. banc 1998). When reviewing a challenge to the sufficiency of the evidence, appellate review is limited to a determination of whether there is sufficient evidence from which a reasonable finder of fact might have found the defendant guilty beyond a reasonable doubt. *State v. Barnum,* 14 S.W.3d 587, 590–91 (Mo. banc 2000). This court accepts as true all of the evidence favorable to the State, including all favorable inferences drawn from the evidence. *State v. Crawford,* 68 S.W.3d 406, 407 (Mo. banc 2002). "All evidence and inferences to the contrary are disregarded." *Id.* at 408.

The State's evidence was sufficient to support the conviction. Davis was aware that Jake was inside the Blazer when he stole it. As Davis was backing the Blazer out of the parking space, Robel was attempting to remove Jake and was screaming at Davis to stop and let her get her son. As Davis drove away, Robel lost her grip on Jake. Jake began screaming as he was being dragged. Robel and at least two other people were yelling as loud as they could at Davis that he was dragging a child. People in shops behind closed doors, people inside cars with their windows up, and a person over 600 feet away clearly heard Robel's screams to Davis that he was dragging her son. The back window on the Blazer was down, and Robel was not far from the Blazer. A reasonable jury certainly could find that it was impossible for Davis not to have heard and understood that he was dragging Jake.

Numerous witnesses reported seeing Davis looking back at where Jake was bouncing against the car. The witnesses were at different locations along the four and a half mile stretch and were unconnected except for this event. The testimony of the witnesses was consistent. Crime scene investigators testified that Davis could have seen Jake from the rear view mirrors of the Blazer. There was also testimony from many different witnesses that Jake was bouncing up to the level of the back windows of the Blazer. Jake was hitting the Blazer with a great deal of force, and the noise of Jake hitting the ground was audible to witnesses in their cars. Reasonable jurors certainly could have found that the concept of Davis being unaware of a body being dragged and slamming repeatedly into the side of the Blazer is simply not a reasonable proposition.

After Davis was blocked in by cars on Noland Road, he got out of the Blazer. When he saw Jake, he did not check to determine whether he was alive or dead. He did not collapse in horrified shock. He did express what could be interpreted as surprise when he said, "I didn't do that." Davis then reentered the Blazer and attempted to drive off, ramming other cars in his futile attempt to escape, with Jake's body still hanging from the Blazer. Davis' actions show a complete disregard for Jake's life.

Davis, in his brief, states: "The first indication that Mr. Davis may have seen Jake was when he was southbound on Highway 291, and by that time Jake was likely dead." This statement is not consistent with the evidence, as three people reported seeing Davis looking back while still in the parking lot at Mr. Goodcents. In any event, the medical examiner testified that Jake was alive when most of his injuries were sustained and was probably alive for most of the event.

Reasonable jurors could infer from the evidence presented by the State that Davis deliberated on the murder. The evidence shows that Davis knew he was dragging Jake when he drove out of the parking lot at the strip mall. Davis then deliberated as he drove across the parking lot, drove out of the parking lot, drove down 291 Highway, drove down I–70, drove down Noland Road, and when he attempted to escape with Jake still hanging from the Blazer. Davis had ample time to abandon the murder. "Deliberation is properly inferred when the defendant had ample opportunity to terminate the crime[.]" *State v. Davis*, 32 S.W.3d 603, 610 (Mo.App.2000). Point denied.

### Photographic Evidence

The fourth and final point on appeal is that the trial court erred in allowing four photographs into evidence. Davis claims that the photos were unnecessary, cumulative, inflammatory, and prejudicial. While the photos were unpleasant, we do not agree that the trial court erred in allowing the photos to be introduced into evidence.

"The trial court is vested with broad discretion in the admission of photographs." *State v. Rousan*, 961 S.W.2d 831, 844 (Mo. banc 1998), *cert. denied* 524 U.S. 961, 118 S.Ct. 2387, 141 L.Ed.2d 753 (1998). The decision of the trial court will not be overturned absent an abuse of discretion. *State v. Mayes*, 63 S.W.3d 615, 631 (Mo. banc 2001). A trial court abuses its discretion when a ruling is "clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Brown*, 939 S.W.2d at 883.

"Photographs, although gruesome, may be admitted where they show the nature and location of the wounds, where they enable the jury to better understand the testimony, and where they aid in establishing any element of the state's case." *State v. Christeson*, 50 S.W.3d 251, 266 (Mo. banc 2001), *cert. denied* 534 U.S. 978, 122 S.Ct. 406, 151 L.Ed.2d 309 (2001). "If a photograph is relevant, it should not be excluded simply because it may be inflammatory." *Rousan*, 961 S.W.2d at 844.

The State had intended to introduce up to twenty post-mortem photos of the victim. The judge culled the number of photos to four. The first photo Davis challenges is State's exhibit 27, a photo of Jake hanging from the Blazer, as he appeared when the Blazer stopped. The photo was admitted into evidence during the testimony of Frank Byam, one the men who apprehended Davis. An objection to the photo was made at the time it was introduced. The State responded to the objection by saying:

> The State understands that when you drag somebody for four and a half miles behind a car it doesn't look very good; but what this shows is what was on the side of the car, what we have had testimony was flipping and flopping and shows clearly that was available to be seen.
>
> And that would, of course, be our argument, whether he saw it or didn't see it.

The court agreed with the State, stating: "It is definitely probative to what he might have seen or not have seen."

The defense did not dispute the fact that Jake had been dragged to his death. The defense, however, presented the argument that Davis did not know that Jake was being dragged. The position of Jake relative to the Blazer, the wheels, and the ground is certainly probative in regard to whether Davis could have seen Jake being dragged. State's exhibit 27 shows Jake's size in relation to the Blazer and his prox-

imity to the side of the Blazer and the wheels. The picture shows how Jake was not being dragged behind or under the Blazer, but rather could only have been dragged beside the Blazer. The twisted condition of the seatbelt and the position of Jake and his clothing, some of which was being dragged behind him, reflects the fact that Jake was indeed bouncing and spinning off the side of the Blazer. The condition and position of Jake, the seatbelt, and the Blazer in the picture corroborate the testimony of the numerous witnesses who testified concerning what they viewed. This picture, while difficult to view, is highly probative to the central question of the case, whether Davis could have seen Jake.

The photo was properly introduced into evidence. The unpleasant content of the photo cannot be ignored but is not grounds for reversal. "Defendants may not so easily escape the brutality of their own actions; gruesome crimes produce gruesome, yet probative photographs." *Feltrop,* 803 S.W.2d at 11. This photo was highly probative. The photo enabled the jury to better understand the testimony of numerous witnesses and aided in establishing a central element of the State's case, specifically Davis' knowledge and intent. *Christeson,* 50 S.W.3d at 266. Thus, the trial court did not err.

The other three photos were taken at autopsy. They were admitted during the testimony of Jackie Pace, a member of the Crime Scene Unit of the Independence Police Department, who took the pictures, and were discussed during the testimony of Dr. Chase Blanchard, the Deputy Medical Examiner of Jackson County. State's exhibit 64 is a close-up view of where the seatbelt, twisted and tangled, was wrapped around Jake's waist. State's exhibit 65 shows Jake lying on his back at the medical examiner's office. State's exhibit 66 shows Jake lying on his stomach. The photos do not show the examination of any internal organs or reflect any cuts made by a medical examiner.

 The photo of the seat belt is, in fact, not particularly gruesome. Photos that are not gruesome are properly admitted when they have probative value. *State v. Smith,* 747 S.W.2d 678, 683 (Mo.App. 1988). The injuries to Jake reflected in the photo are only deep scrapes and bruises. They are not the types of injuries that would normally be considered gruesome, shocking, or repellent and, therefore, prejudicial. However, under the circumstances of the case, it is possible that the photo might be somewhat inflammatory, coupled with the other photos. That does not mean, however, that the admission of the photo was error. The photo is highly probative. The location and condition of the seatbelt is difficult to understand with mere witness description, no matter how detailed. The twisting of the seatbelt, reflected in the photo, corroborates the testimony of witnesses that Jake was bouncing and twisting off the side of the Blazer. It would be virtually impossible for the seatbelt to be twisted in such a manner if Jake's body had not spun around numerous times. If Jake was bouncing and twisting, it is more likely that Davis would have heard or seen him. Thus, the photo enabled the jury to better understand the testimony of numerous witnesses and aided in establishing a central element of the State's case, specifically, Davis' knowledge and intent. *Christeson,* 50 S.W.3d at 266. The trial court did not err in allowing this photo to be introduced into evidence.

 The last two photos, State's exhibits 65 and 66, give a clear and comprehensive view of Jake's injuries by showing his entire body, first from the front and then from the back. Davis argues that since there was no issue as to the identity of the deceased and the nature of the fatal character of the wound was easily established

and understood, the trial court erred in introducing them into evidence. The photos are troubling. The head wound that caused Jake's death is evident, as are numerous scrapes and bruises. However, the mere fact that the photos were potentially inflammatory does not mean that they were not properly introduced into evidence.

The photos were highly probative. First, they showed the nature and location of the wounds. Second, they allowed the jury to better understand the testimony of a witness, the medical examiner, Dr. Blanchard. Dr. Blanchard testified extensively concerning the injuries that Jake sustained. Much of the testimony centered on which injuries were sustained before or after death. The difference between the injuries sustained before, as opposed to after, death is easy to discern. Injuries sustained before death have a red color, while injuries sustained after death have a yellow or tan color. The differences were readily apparent from the photos. However, without the photos, the testimony of Dr. Blanchard would have been confusing and difficult to remember.

Third, the photos also reflect that the injuries Jake sustained were consistent with the testimony of earlier witnesses who saw Jake being dragged. Jake's chest appears to have no injury, while his extremities have deep scrapes and bruises and the back of his head has a large injury. The injuries are consistent with numerous witnesses' testimony that Jake was spinning and hitting his head repeatedly against the side of the Blazer. The fact that Jake was bouncing against the Blazer is in direct contradiction with Davis' defense, that he had no idea he was dragging Jake. It is virtually impossible that Davis did not hear or visually notice a body spinning and thumping against the Blazer if the location of Jake's body corre-

sponds with eyewitness testimony. The photos support the eyewitnesses' version of events.

The photos were properly admitted because they showed the nature and location of wounds, they enabled the jury to better understand the testimony of the medical examiner, and they aided in establishing an element of the State's case. *Id.* The fact that the photos are gruesome does not preclude their use at trial. "To exclude graphic evidence solely because it is graphic would deprive the State of evidence when it needs it the most: the evidence would be inadmissible to prosecute what are typically the most serious crimes." *Mayes,* 63 S.W.3d at 632. The trial court did not err.

We also note that the trial court gave the jury an instruction when the photos were introduced:

Ladies and gentlemen, I'm going to admit this exhibit.

The concern always with photographs which are difficult to look at is that the jury looks at those and then never sees anything else. So this is—and I have culled through the photographs that will be offered and reduced them down to those that I think may be fair or may be necessary frankly.

I would tell you though that there is other evidence, of course, besides photographs; and you are to consider all the evidence completely; and the case is not even close to being submitted to you yet. So keep that in mind.

The trial court also questioned potential jurors in voir dire concerning their tolerance for such photos. The trial court made every effort to mitigate the inflammatory nature of the photos and properly used its discretion to allow the introduction of a limited number of photos. Furthermore, the photos in this case were less inflammatory than photos introduced in other cases and upheld as proper. *See*

*Rousan,* 961 S.W.2d at 844 (photos of decomposed bodies recovered after being buried for approximately one year were properly introduced); *Feltrop,* 803 S.W.2d at 10–11 (photos of dismembered victim allowed, specifically picture of torso in trunk, body parts in trash bags, and close up photos of wounds); *State v. Schneider,* 736 S.W.2d 392, 403 (Mo. banc 1987) (twenty-nine photos of the various stages of autopsy on a victim properly admitted). Davis does not show that the decision of the trial court was clearly against the logic of the circumstances then before the court and is so arbitrary and so unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Brown,* 939 S.W.2d at 883.

### Conclusion

For the foregoing reasons, we affirm the judgment of conviction.

HOLLIGER and SPINDEN, JJ., concur.