STATE of Missouri, Respondent,

v.

Bobby COLLINS, Appellant.

No. ED 85821.

Missouri Court of Appeals,
Eastern District,
Division Four.

Feb. 21, 2006.

Motion for Rehearing and/or Transfer to
Supreme Court Denied March 28, 2006.

Application for Transfer Denied
May 2, 2006.

Gwenda R. Robinson, St. Louis, MO, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Shaun J. MacKelprang, Jefferson City, MO, for respondent.

NANNETTE A. BAKER, Presiding Judge.

### Introduction

Bobby Collins ("Defendant") appeals from a judgment entered after a jury found him guilty of one count of burglary in the first degree in violation of Section 569.160,[1] ten counts of armed criminal action in violation of Section 571.015 ("ACA"), one count of robbery in the first degree in violation of Section 569.020, four counts of forcible sodomy in violation of Section 566.060, one count of attempted forcible sodomy in violation of Section 564.011, two counts of forcible rape in violation of Section 566.030, and one count of kidnapping in violation of Section 565.110. The trial court orally sentenced Defendant to fifteen years of imprisonment each for four counts and thirty years of imprisonment each for the remaining sixteen counts.

Defendant claims three points on appeal. First, Defendant claims that the trial court erred in overruling his motions for judgment of acquittal of ACA because the State presented insufficient evidence to prove beyond a reasonable doubt that he used a gun or other deadly weapon to knowingly enter Victim's residence unlawfully to commit the felony of burglary in the first degree therein (Count II), forcible rape (Count XVIII) and forcible sodomy (Count XX). Second, he contends that the trial court plainly erred in failing to grant a mistrial because after the jury retired to deliberate, a juror disclosed that she possibly knew Victim from her employment. Third, Defendant argues that the trial court plainly erred in entering a written

---

1. All statutory references are to RSMo.2000, unless otherwise indicated.

sentence and judgment of 510 years of imprisonment, which was materially different from the trial court's oral statement that the total sentence was 480 years of imprisonment. We affirm in part and reverse and remand in part.

### Factual Background and Proceedings Below

Viewed in the light most favorable to the judgment, the evidence shows the following: On March 17, 2002, Defendant broke into K.K.'s ("Victim") home while she was sleeping. She was sleeping on her stomach when she felt something heavy, like her cat, jump on her. Then she heard the door outside of her bedroom that led to the basement open and close. When she looked up from her bed, she saw Defendant standing in the doorway.

Defendant turned off the light and jumped on top of Victim. He put a gun to her head and told her to shut up or he would kill her. She fought, but Defendant grabbed her head and put the gun down her throat. Once again, he told her to shut up or he would kill her. This time, she complied.

When Defendant told Victim that he was going to have sex with her, she told him that she was on her period. So Defendant made her perform oral sex on him. As she did, Defendant, who was wearing latex gloves, stuck his finger in her pants to see if she was actually on her period.

When he discerned that she was not on her period, Defendant attempted to penetrate Victim's vagina with his penis, but he penetrated her anally instead. She told Defendant to stop and that she would remove her pants so that he could penetrate her vagina. Defendant then inserted his penis in her vagina and penetrated her anus with his finger. Victim, fearing that she would get pregnant or contract a sexually transmitted disease, asked Defendant to wear a condom from her nightstand drawer, but he refused. At various times during the attack, Defendant threatened to kill Victim if she "gave him anything," looked at him, or did not shut up. He also hit her on the head with the gun multiple times.

After the first rape, Defendant bound Victim's legs and arms with a towel and bed sheets, tying her face down on the bed. He asked her where her money and jewelry were. After she answered him, he left the room to obtain the items she mentioned. When he returned, Defendant noticed that she had loosened some of her bonds, so he asked her where he could get some tape.

Defendant then bound Victim's hands and feet with tape and covered her head with blankets and pillows. He turned on the bedroom lights and went through her belongings, looking for jewelry. He searched her apartment and returned to the bedroom at various times to have vaginal and oral sex with Victim. At one point, when she moved her head to breathe easier, she saw Defendant, in the reflection of a mirror, standing behind her. She watched Defendant stick the barrel of his gun into her anus, but then looked away because she was afraid. Defendant then forced her to perform oral sex again.

Victim heard Defendant pack her laptop computer. As Defendant continued to gather Victim's belongings, she started getting out of the tape. When Defendant discovered this, he used more tape to bind her. Defendant then raped her again, this time he ejaculated.

Defendant left Victim's apartment with various pieces of her personal property. After Victim broke out of her bonds, she called 911. In the meantime, Victim wiped herself on the bed sheets, preserving seminal fluid that linked Defendant to the

crime. When police officer John DeSpain arrived at Victim's home, he found the glass on the front door to Victim's apartment broken and the door slightly ajar. Officer Mark Karpinski, a crime technician, testified that he seized the broken glass from the front door and attempted to lift fingerprints from the door. However, he found no fingerprints because the defendant was wearing gloves when he broke into the apartment.

Officer DeSpain transported Victim to the hospital where a sexual assault kit was performed. The DNA from the various samples linked Defendant to the crime. Victim later viewed a photographic line-up and stated that Defendant looked familiar.

The State charged Defendant with Count I of burglary in the first degree, Counts II, IV, VI, VIII, X, XII, XIV, XVI, XVIII, and XX of ACA, Count III of robbery in the first degree, Counts V, VII, XV, and XIX of forcible sodomy, Count IX of attempted forcible sodomy, Counts XI and XVII of forcible rape, Count XIII of kidnapping, and Count XXI of assault in the third degree.

On December 9, 2004, the jury found Defendant guilty of all counts except Count XXI of assault in the first degree. On January 28, 2005, the trial court orally sentenced Defendant to fifteen years' imprisonment on Counts I, II, XIII, and XIV and thirty years' imprisonment for each of the remaining sixteen counts, Counts III through XII and Counts XV through XX. At the end, the court announced that "[a]ll of these sentences shall be consecutive with each other for a total of 480 years." On February 2, 2005, Defendant timely filed his notice of appeal.

### Discussion

#### I. Armed Criminal Action

In his first point on appeal, Defendant claims that the trial court erred in overruling his motions for judgment of acquittal because the State presented insufficient evidence to prove beyond a reasonable doubt that he used a gun or other deadly weapon to knowingly (1) enter Victim's residence unlawfully to commit the felony of burglary in the first degree therein (Count II) and (2) in the forcible rape (Count XVIII) and forcible sodomy (Count XX) of Victim.

To be guilty of ACA, a person must commit "any felony under the laws of this state by, with, or through the use, assistance, or aid of a dangerous instrument or deadly weapon." Section 571.015.1. Under Section 556.061(9), a "dangerous instrument" is defined as "any instrument, article or substance, which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury."

On appeal from a jury-tried criminal case, it is not the role of a reviewing court to weigh the evidence, but rather, it is the function of the jury to determine beyond a reasonable doubt whether defendant was guilty of the offense charged. *State v. Brown*, 660 S.W.2d 694, 698 (Mo. banc 1983). In assessing the sufficiency of the evidence, we must accept as true all evidence and inferences that tend to support the verdict and disregard all evidence and inferences to the contrary. *Id.* at 698–99. The question is whether the evidence viewed in a light most favorable to the State, is sufficient to support the verdict. *Id.* at 699. We consider whether the evidence was sufficient to make a submissible case from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes charged. *State v. Hopkins*, 140 S.W.3d 143, 157 (Mo.App. E.D.2004).

## A. First Degree Burglary

"[A] person commits ACA in connection with burglary . . . if he or she uses a dangerous instrument or deadly weapon either to effectuate unlawful entry to a building or for the purpose of committing the denominated crime therein; the crime of ACA is committed in a burglary setting if the weapon or instrument is *used to gain entry* for the purpose of committing a crime therein." *Hopkins,* 140 S.W.3d at 157 (citing *State v. Carpenter,* 109 S.W.3d 718, 723 (Mo.App. S.D.2003)). In order for the defendant to have committed ACA in the course of committing the first degree burglary, "he must have gained entry by, with or through the use, assistance, or aid" of a gun, most likely by either shooting the door open or by holding the victim at gunpoint and demanding that she open the door. *Hopkins,* 140 S.W.3d at 157–58. *See also State v. Dudley,* 51 S.W.3d 44, 52 (Mo.App. W.D.2001) (holding that where the only evidence of entry into the house was that the door was kicked open, there was nothing in the record from which a reasonable jury could infer that unlawful entry was had "by, with, or through the use, aid, or assistance of the gun" used to injure the victim).

The cases *State v. Reynolds,* 819 S.W.2d 322, 327 (Mo. banc 1991), *Hopkins,* and *Carpenter* all involve a defendant who was convicted of ACA in connection with first-degree burglary. In each case, the conviction was overturned. In *Reynolds,* the defendant committed the first-degree burglary with an accomplice. 819 S.W.2d at 327. Either Reynolds or his accomplice jimmied the back door. *Id.* When that did not work, one of the men broke the glass out of the back door, reached inside, unlocked the door, and they both came inside. *Id.* Police officers arrested the two men as they were running away. *Id.* When they searched Reynolds, they found a knife in a sheath in his boot, "hooked inside the boot." *Id.* The prosecution claimed that even if Reynolds did not remove the knife from his boot prior to his arrest, sufficient evidence still existed to warrant his conviction for ACA. *Id.* at 327–28. The Missouri Supreme Court reasoned "that the use of a dangerous instrument or deadly weapon is an element of [ACA]" and that "the intention to use, without actual use, is not enough to convict under the [ACA] statute." *Id.* at 328, 329. The Court reversed the ACA conviction, holding that "[t]here was no evidence that Reynolds committed the burglary by, with, or through the use of the knife or other deadly weapon." *Id.* at 329.

In *Hopkins,* the defendant stabbed the victim with an unknown object after breaking into his home. 140 S.W.3d at 147. The victim testified that in order to get into the bedroom where he was attacked, one would have to gain entry through four different doors. *Id.* at 158. He testified that three of the doors were either kicked or pried open and the fourth door leading directly into the victim's bedroom, may have been opened by hand. *Id.* This court determined that as the crime was charged, Hopkins completed the crime of first degree burglary when he unlawfully entered into the victim's occupied home with the intent to assault him. *Id.* Although there was sufficient evidence that a dangerous instrument was used to commit the assault, evidence of its use to commit the burglary was virtually non-existent. *Id.* at 159. This court noted, "It is mere speculation to assume that the sharp object used to assault [the victim] was also used to gain entry into his home." *Id.* Because the crime of burglary first degree was completed when Hopkins entered the occupied home, this court held that the events that occurred after that unlawful entry are not relevant to a determination of whether ACA in connection with the underlying

felony of burglary, as charged, was committed. *Id.*

Finally, in *Carpenter*, the defendant threatened and attacked the victim after breaking into her home. 109 S.W.3d at 720. Like *Reynolds* and Hopkins, the defendant in *Carpenter* was charged with ACA, with first-degree burglary as the underlying charge. *Id.* at 721. The victim was awakened by a noise and got up and saw a flash go through the kitchen and heard glass breaking. *Id.* at 720. Carpenter broke in the back door of the victim's house by breaking out the glass and kicking the door open and shot the front of her oven with a .22 caliber rifle. *Id.* After he broke into her home, he got on top of her and placed the rifle at her throat. *Id.* The jury found Carpenter guilty of both first-degree burglary and ACA in connection with the burglary charge. *Id.* at 721. The Southern District reasoned that the crime of first-degree burglary was completed when Carpenter unlawfully entered into the victim's house with the intent to assault her while the victim was in the house. *Id.* Furthermore, the court held that in order for Carpenter to have committed ACA in the course of committing the first-degree burglary, he must have gained entry "by, with, or through the use, assistance, or aid of" the rifle. *Id.* at 723. Since there was no evidence suggesting that this occurred, the court reversed Carpenter's conviction and sentence for ACA. *Id.* at 723, 724.

In the instant case, the jury instruction on the charge of burglary in the first degree reads as follows:

First … the defendant knowingly entered unlawfully an inhabitable structure … and

Second, that defendant did so for the purpose of committing the crime of stealing therein, and

Third, that while the defendant was in the inhabitable structure [Victim] was present in the structure and [Victim] was not a participant in the crime, then you will find the defendant guilty under Count I burglary in the first degree.

Thus, as the crime was charged here, Defendant completed the crime of first degree burglary upon his unlawful entry into Victim's occupied home with the intent to assault her.

The jury instruction on the charge of ACA in connection with the underlying felony of burglary in the first degree reads as follows:

First, that defendant committed the offense of burglary in the first degree, as submitted in [the jury instruction on the charge of burglary in the first degree] Second, that defendant knowingly committed that offense by or with or through the use of a dangerous instrument, then you will find the defendant guilty under Count II of armed criminal action.

Therefore, a finding that Defendant gained entry "by or with or through the use of a dangerous instrument" is necessary to find that he committed ACA in the course of committing the first degree burglary that was charged here. However, the State failed to offer any evidence that Defendant entered Victim's apartment "by, with, or through the use, aid, or assistance of the gun." While there was evidence that Defendant had a gun, there was no evidence that he used his gun to gain entry into Victim's apartment. The only testimony regarding how Defendant entered the home came from Officer DeSpain and Victim. Officer John DeSpain testified that when he first arrived on the scene he "noticed that the glass on the front door was broken and the door was slightly open." Victim, although at home when Defendant entered, was asleep in bed so

she was unable to testify as to how Defendant gained entry. The State failed to prove beyond a reasonable doubt an essential element of ACA in that the evidence was insufficient to prove, as required, that the burglary, on which the ACA conviction was predicated, was committed by, with, and through the use, aid, and assistance of a deadly weapon. Here, as in *Hopkins,* it is mere speculation to assume that the gun used to assault Victim was also used to gain entry into her home. As such, Defendant's conviction for Count II, one count of ACA based on his conviction for first degree burglary (Count I), is reversed.

### B. Forcible Rape and Forcible Sodomy

In *State v. Boyd,* 844 S.W.2d 524, 526 (Mo.App. E.D.1992), this court held that when the defendant threatened the victim using a dangerous instrument, the use of the dangerous instrument "aided" the defendant in committing the felonies of rape and sodomy by placing the victim in fear and forcing the victim to submit to the defendant. In *State v. Hyman,* the Western District held that as long as the victim believed that the defendant still possessed the dangerous weapon throughout the entire ordeal, it can still be said that the defendant committed those acts through the use, assistance, or aid of a dangerous instrument. 11 S.W.3d 838, 841 (Mo.App. W.D.2000). In other words, the initial force enabled and aided the defendant to commit the subsequent crimes. *Id..*

In the instant case, the record reflects that Defendant's gun aided him in committing forcible rape and forcible sodomy. Throughout Victim's ordeal, Defendant threatened her with his gun. At various intervals during her ordeal, Defendant held the gun to her head and told her to shut up or he would kill her. He also hit her in the head a couple of times with the gun. At one point while he was raping

her, Victim saw Defendant stick the gun into her anus in the mirror's reflection. Because the record reflects that the gun aided Defendant by placing Victim in fear and forcing her to submit to him, Defendant's convictions for Count XVIII, one count of ACA based on forcible rape (Count XVII), and Count XX, one count of ACA based on forcible sodomy (Count XIX), are affirmed.

### II. Juror Nondisclosure

In his second point on appeal, Defendant claims that the trial court plainly erred in failing to grant a mistrial because after the jury retired to deliberate, Juror Number 924 untimely disclosed that she possibly knew Victim from her employment at St. Vincent Psychiatric Hospital.

Mistrial is a drastic remedy that should be employed only in the most extraordinary circumstances. *State v. Davis,* 107 S.W.3d 410, 419 (Mo.App. W.D.2003). The decision whether to grant a mistrial is left primarily to the trial court, which is in the best position to determine whether the complained-of incident had any prejudicial effect on the jury. *Id.* A trial court's decisions concerning juror misconduct will not be disturbed unless there is abuse of discretion. *Id.* The trial court abuses its discretion when its ruling is clearly against the logic of circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Id.* If reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. *Id.*

Defendant concedes that his assignment of error was not properly preserved for appellate review and he requests that this court exercise its discretion and review for plain error. Plain errors affecting substantial rights may be considered in the discretion of the court if

it appears on the face of the record that the alleged error so substantially affected defendant's rights that a miscarriage of justice or manifest injustice would occur if the error were not corrected. Rule 30.20;[2] *State v. Mayes,* 63 S.W.3d 615, 624 (Mo. banc 2001). Whether manifest injustice occurred depends on the facts and circumstances of the particular case, and the defendant bears the burden of establishing manifest injustice amounting to plain error. *Id.*

In the instant case, while the jury was deliberating, the jury sent a question to the trial court. The jury question was, "There is a chance that [Victim] was a patient at the facility that I worked at. St. Vincent Psych Hospital. Was she a patient after this incident occurred? Please provide photos entered in evidence." The handwritten word and number, "Juror 924," are in parentheses in the right-hand corner of the page recording the jury's question. After the court received the question, the following exchange occurred on the record:

> Court: Let the record reflect that counsel's in chambers outside the hearing of the jury which is deliberating. We have a question from the jury. And it's really a statement at the beginning which is as follows: Quotes, there is a chance that [Victim] was a patient at the facility that I worked at, St. Vincent Psych Hospital. Was she patient after this incident occurred? Let's go off the record.
>
> (At this time a discussion was held off the record).
>
> Court: Then following that statement and question it says, please provide photos entered into evidence. Now, the Court would propose to answer the jury's inquiry as follows: I cannot answer the question. Here are the photographs admitted into evidence. Does either counsel object to that response?

> [Prosecutor]: No.
>
> [Defense Counsel]: No.

The trial court's response to the jury's question was: "I cannot answer your question. Here are the photographs admitted into evidence." Juror 924 remained seated on the jury that found Defendant guilty of twenty counts of criminal conduct.

■ Generally, an announcement of "no objection" amounts to an affirmative waiver of appellate review of the issue. *State v. Goudeau,* 85 S.W.3d 126, 128 (Mo. App. S.D.2002) (quoting *State v. Markham,* 63 S.W.3d 701, 707[10] (Mo.App. S.D. 2002)); *State v. Stillman,* 938 S.W.2d 287, 290 (Mo.App. W.D.1997). Under such circumstances, even plain error review is not warranted. *Goudeau,* 85 S.W.3d at 128–29. This general rule not only attends when the issue is admissibility of evidence, but also when a court's conduct or ruling regarding a jury is challenged as erroneous. *Id.* at 129.

*State v. Stevens* is factually similar to the instant case. 949 S.W.2d 257 (Mo. App. S.D.1997). The defendant alleged that the trial court plainly erred in failing to inform the jury of the "mandatory minimum term law" applicable to robbery in the first degree. *Id.* at 258. During jury deliberations, the jury asked, "What is the minimum number of years to be served compared to the sentence given by the jury?" *Id.* Before responding to the jury's question in writing, the judge asked the prosecutor and the defense attorney if his response was satisfactory. *Id.* The following exchange occurred between the court and the attorneys:

> Court: I intend to respond in writing: This is a question I am not authorized to answer. What does the State say?
>
> [State]: I think that's proper, Your Honor.

**2.** All rule references are to Mo. Rule Crim. P.2002, unless otherwise indicated.

Court: What does the defense say?

[Defense]: I agree.

*Id.* The Southern District reasoned that the defendant's claim of plain error was not subject to appellate review because he acquiesced in the trial court's response to the jury when he announced that he had no objection to the proposed response. *Id.* Therefore, the court held that the defense affirmatively waived appellate court's review of the issue and declined plain error review. *Id.* at 259.

Like the defense counsel in *Stevens*, defense counsel in the instant case affirmatively waived this issue. When the trial court asked if either counsel had objections to the court's proposed response to the jury's question, both answered, "No." Defense counsel's response to the trial court's question was not a simple failure to object, but an affirmative statement that she had no objection to the court's answer to the jury's question. Here, as in *Stevens*, since defense counsel's response was an affirmative waiver, this court declines to exercise its discretion to review for plain error. Point denied.

## III. *Inconsistent Oral and Written Sentence*

 In his third point on appeal, Defendant claims that the trial court plainly erred in entering a written sentence and judgment of 510 years of imprisonment because it was materially different from the trial court's statement that the total sentence was 480 years of imprisonment.

Defendant concedes that he failed to properly preserve this assignment of error for appellate review and requests plain error review under Rule 30.20. We discussed the standard of review for plain error in the previous point.

At sentencing, the court stated:

Mr. Collins, the crimes which you committed on March 17, 2002 are the most heinous that I have seen during my 12 years on this bench. Heinous crimes deserve harsh punishment. . . . I believe that it is in the best interest of our society and in accord with my sworn duty to give you the most severe sentence allowable under the law. . . .

[I]t is the judgment and sentence of this Court defendant shall be sentenced to imprisonment in the Missouri Department of Corrections for a term of 15 years under Count II—excuse me, 15 years under Count I, 15 years under Count II, consecutive with each other for a total of 30 years; 30 years under Count III, 30 years under Count IV, 30 years under Count V, 30 years under Count VI, 30 years under Count VII, 30 years under Count VIII, 30 years under Count IX, 30 years under Count V, 30 years under Count XI, 30 years under Count XII, 15 years under Count XIII, 15 years under Count XIV, 30 years under Count XV, 30 years under Count XVI, 30 years under Count XVII, 30 years under Count XVIII, 30 years under Count XIX, and 30 years under Count XX.

. . . All of these sentences shall be consecutive with each other for a total of 480 years.

The written sentence correctly reflected the term of imprisonment on every count, except Count V, which was blank. The total number of years reflected on the written form was therefore 510 years. Defendant claims that the trial court plainly erred, causing a manifest injustice or a miscarriage of justice in entering a written sentence that materially differed from the oral pronouncement. He urges this court to reverse and remand to the trial court to correct the error in Defendant's written sentence and judgment *nunc pro tunc.* Defendant contends that the trial court intended to impose a 480 year term of imprisonment and he asks this Court to

order the trial court to enter a sentence of 480 years to reflect its oral pronouncement.

■ Generally, where the written sentence differs from the sentence orally imposed, the oral pronouncement controls unless the record shows that the oral sentence is not materially different than the written one, or the trial court had no discretion to enter a sentence different from the written one. *State v. Hawkins,* 973 S.W.2d 179, 180 (Mo.App. E.D.1998).

We agree that there was a mistake in sentencing which should be corrected, however it is not the mistake of which the defendant complains. The record clearly reflects that the trial court's oral pronouncement of sentence actually totaled 540 years even though the court mistakenly stated that the total was 480 years, and the written sentence reflected a total of 510 years. Therefore, the written and oral sentences were materially different.

The question then becomes whether the trial court's statement that the terms of imprisonment totaled 480 years is controlling. It is not. In its oral pronouncement, the court clearly specified a term of imprisonment for each count and stated that the twenty counts were to run consecutively. After the trial court pronounced sentence on each count, it was not necessary to articulate the total term of years. The court's additional statement that Defendant's sentence would be for a total of 480 years was mere surplusage.

■ It is clear from the record that the court orally sentenced Defendant to 30 years on Count V. Therefore, the omission of the 30 year sentence on Count V in the written judgment was a clerical mistake in the recording of the sentence.[3] Where as here, the judge's intentions are clear from the record, clerical mistakes may be corrected by a *nunc pro tunc* order. *State v.*

*Jackson,* 158 S.W.3d 857, 858 (Mo.App. E.D.2005). Therefore, a remand is necessary in this case for correction of the written judgment to reflect the sentence as orally imposed.

### Conclusion

Defendant's conviction for ACA in Count II is reversed and the cause is remanded to the trial court for entry of a corrected written sentence that is consistent with its oral pronouncement and this opinion.

ROBERT G. DOWD, JR., and SHERRI B. SULLIVAN, JJ., concur.

---

**3.** A review of the sentencing form indicates other clerical mistakes in Counts XIV and XV.