**STATE of Missouri, Respondent,**

v.

**Norman V. HOPKINS, Appellant.**

**No. ED 82033.**

Missouri Court of Appeals,
Eastern District,
Division Four.

May 25, 2004.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 8, 2004.

Application for Transfer Denied
Aug. 24, 2004.

Nancy A. McKerrow, Columbia, MO, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Dora A. Fichter, Jefferson City, MO, for respondent.

BOOKER T. SHAW, Presiding Judge.

Norman V. Hopkins ("Hopkins") appeals from the trial court's judgment entered in the Circuit Court of St. Louis County upon his conviction by a jury of one count of burglary in the first degree, in violation of Section 569.160, RSMo 2000, one count of assault in the first degree, in violation of 565.050, RSMo 2000, and two counts of armed criminal action ("ACA"), in violation of Section 571.015, RSMo 2000. As a prior and persistent offender, Hopkins was sentenced respectively to one fifteen-year term and three thirty-year terms of imprisonment to run concurrently.

Hopkins raises three points on appeal. In his first point, Hopkins argues the trial court erred in overruling his challenges to the State's use of its peremptory strikes to remove African–American Venirepersons Bell, Acklin and Owens because the explanations given by the State were mere pretext for removing them on the basis of their race. In his second point, Hopkins argues the trial court erred in overruling his motions for judgment of acquittal and sentencing him upon his conviction of ACA in connection with the underlying felony of burglary in the first degree because the State failed to present evidence necessary for a jury to find by a "subjective state of near certitude" that he committed burglary "by, with or through the use of a dangerous instrument." Finally, in his third point, Hopkins argues the trial court abused its discretion in allowing the State to introduce evidence of a conversation he had with Robin Hopkins ("Robin") because that evidence was barred by the marital confidential communication privilege ("marital privilege").

We find that, based upon the applicable standard of review for Point I, a mistake was made in allowing the State to utilize peremptory strikes to remove Venireper-

sons Bell, Acklin and Owens from the venire panel. Therefore, we reverse and remand this case for a new trial.

Hopkins was married to Robin in September of 1989. In 1999, Hopkins fathered a child outside of their marriage, which caused turmoil in their relationship. As a result, Hopkins and Robin eventually separated in August of 2001. In September of 2001, Robin began dating Byron Nunley ("Nunley"), and shortly thereafter began living with him.

Hopkins subsequently found out about Robin's relationship with Nunley and threatened Nunley several times over the telephone. Hopkins also left numerous threatening messages on Robin's cellular telephone regarding her relationship with Nunley. In early October of 2001, Hopkins called Nunley's mother, Floyda Moore, and told her that her son was "fooling" with his wife and to tell Nunley that if he caught him with Robin, he would kill him. At approximately 1:00 a.m. on October 16, 2001, while Hopkins was at Robin's sister's house, he announced that he would "get" Robin and Nunley. Robin's sister, Sheila Underwood, called Robin and warned her that Hopkins was coming to Nunley's house. Shortly thereafter, at approximately 3:00 a.m., while asleep in Nunley's bedroom, Nunley and Robin were awakened by the telephone ringing once. Moments later, they saw Hopkins breaking into their bedroom wearing dark clothes and a mask on his face. Hopkins told Nunley, "Nigger, got my wife down here," pulled him onto the floor and stabbed him. Robin ran upstairs and hid in a closet. Nunley heard Hopkins say, "Give me a strap and let me finish this Nigger," and then saw him leave the room. Nunley then went upstairs and told his sister to call the police. Nunley was taken to the hospital where he suffered a collapsed lung as a result of the stab wound.

The police determined that entry into Nunley's residence was gained through a side door leading to the garage. In order to reach Nunley's bedroom from the outside of the house, one would have to enter a total of four doors.

At trial, Robin and Nunley both identified Hopkins as the person who broke into Nunley's bedroom and stabbed Nunley. Robin's son, Deandre Reece, testified that Hopkins returned to Sheila Underwood's house around 3:30 a.m. on the morning the crimes were committed. Hopkins testified at trial that he was fishing with his father on the morning of the crimes, a story that was corroborated by his father's testimony.

At the close of all of the evidence, the jury found Hopkins guilty of burglary in the first degree, assault in the first degree and two counts of ACA. The trial court sentenced Hopkins, as a prior and persistent offender, to one fifteen-year term of imprisonment for the burglary and three concurrent thirty-year terms of imprisonment on the remaining counts. This appeal follows.

## I. Batson Challenges

In his first point on appeal, Hopkins argues the trial court erred by overruling his challenges to the State's use of its peremptory strikes to remove African-American Venirepersons Bell, Acklin and Owens from the venire panel because the explanations given by the State were mere pretext for removing them on the basis of their race. Hopkins specifically argues that there were similarly situated white venirepersons who were not struck.

■ It is a violation of the Equal Protection Clause for a party to exercise a peremptory strike to remove a potential juror solely on the basis of the juror's gender, ethnic origin, or race. *State v.*

*Marlowe,* 89 S.W.3d 464, 468 (Mo. banc 2002) (citing *United States v. Martinez–Salazar,* 528 U.S. 304, 315, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000)). In *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court held that in a state criminal trial it is a violation of the Fourteenth Amendment for the prosecution to utilize peremptory strikes in a racially discriminatory fashion.

On a *Batson* challenge, we give the trial court's determination great deference and will not set it aside unless we find clear error. *State v. Costello,* 101 S.W.3d 311, 312 (Mo.App. E.D.2003) (citing *State v. Antwine,* 743 S.W.2d 51, 66 (Mo. banc 1987), *cert. denied,* 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988), 498 U.S. 1055, 111 S.Ct. 769, 112 L.Ed.2d 789 (1991)). When deciding clear error, we evaluate the entire evidence to determine if we are left with a definite and firm conviction that a mistake has been made. *State v. Davis,* 894 S.W.2d 703, 707, 710 (Mo.App. W.D.1995) (reversing the trial court and holding that it was clear error for the court to deny the defendant's objection to the State's peremptory strike of an African–American venireperson where the State failed to provide a sufficient and legitimate race-neutral reason to support the strike).

In 1992, the Missouri Supreme Court established the procedure for *Batson* challenges in *State v. Parker,* 836 S.W.2d 930, 939 (Mo. banc 1992), *cert. denied,* 506 U.S. 1014, 113 S.Ct. 636, 121 L.Ed.2d 566 (1992). First, the defendant must raise a *Batson* challenge with regard to one or more specific venirepersons struck by the state and identify the cognizable racial group to which the venireperson or persons belong. *Id.* The trial court will then require the state to come forward with reasonably specific and clear race-neutral explanations for the strike. *Id.* Assuming the prosecutor is able to articulate an acceptable reason for the strike, the defendant will then need to show that the state's proffered reasons for the strikes were merely pretextual and that the strikes were racially motivated. *Id.*

There are thus three stages to resolve a *Batson* challenge. *Marlowe,* 89 S.W.3d at 468. In the first stage, once a party utilizes a peremptory strike, his opponent must allege that it is discriminatory. *Id.* In the second stage, the party who used the peremptory strike is required to give a race-neutral explanation for the strike. *Id.* The initial explanation given by the proponent to strike a venireperson is deemed race-neutral unless a discriminatory intent is inherent in the prosecutor's explanation, even if it would result in a disproportionate removal of minority venirepersons. *Parker,* 836 S.W.2d at 934 (citing *Hernandez v. New York,* 500 U.S. 352, 359–60, 111 S.Ct. 1859, 114 L.Ed.2d 395, (1991)). The race-neutral explanation for the strike need not be persuasive at this second stage of a *Batson* inquiry. *Marlowe,* 89 S.W.3d at 469 (citing *Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995)). It is in the third stage of a *Batson* inquiry that the court looks to the persuasiveness of the justification given in support of the strike. *Id.* Finally, it is in this third stage, that the trial court must determine whether the opponent of the strike carried his or her burden by proving purposeful discrimination. *Id.* The opponent of the strike must show that the reasons given in support of the strike are merely pretextual. *Id.* The court looks to the plausibility of the explanation for striking the potential juror to determine if it is mere pretext. *Id.*

"In determining pretext, the first factor to be considered is 'the existence of similarly situated white jurors who were

not struck.'" *Id.* (quoting *Parker*, 836 S.W.2d at 940). This is a crucial factor in determining pretext. *Id.* "Post-hoc justifications are irrelevant" at this stage, the focus is on the plausibility of the contemporaneous explanation. *Id.*

■■■ The second factor in determining pretext is the "'degree of logical relevance between the proffered explanation and the case to be tried.'" *Id.* (quoting *Parker*, 836 S.W.2d at 940). The third factor to be considered is the prosecutor's credibility, based upon "'the prosecutor's demeanor or statements [made] during voir dire,' as well as, the 'court's past experiences with the prosecutor.'" *Id.* (quoting *Parker*, 836 S.W.2d at 940). The fourth and final factor in determining pretext is "'the demeanor of the excluded venirepersons.'" *Id.* at 470 (quoting *Parker*, 836 S.W.2d at 940). In making its determination as to pretext, the trial court must, however, consider the totality of the facts and circumstances surrounding the case. *Id.*

Here, the record reveals that twenty-nine venirepersons were called for service on the venire panel, including seven prospective African–American jurors and one prospective Hispanic juror. One of the seven prospective African–American jurors, Venireperson Wells–White, was stricken for cause by Hopkins's counsel ("Defense Counsel"). Of the remaining venirepersons eligible for selection, there remained six African–American jurors and one Hispanic juror, juror numbers 4, 6, 14, 20, 21, 28, and 16 respectively.

The State initially attempted to utilize five of its seven peremptory strikes to remove juror numbers 6, 14, 20, 28 and 16 from the venire panel. However, Hopkins is only challenging the removal of juror numbers 6, 14 and 28, Venirepersons Bell, Acklin and Owens, respectively, and so we

will first address the removal of these jurors.

The first two stages of a *Batson* challenge were properly adhered to throughout the jury selection process here. Therefore, we focus our analysis on the third stage of a *Batson* challenge, the determination of whether the opponent of the strike has carried his burden of proving purposeful discrimination. *See Marlowe*, 89 S.W.3d at 469.

### A. *Juror Number 6 (Bell)*

■■■ During Defense Counsel's voir dire, juror number six, Aeesha Bell ("Bell") stated that she "recognizes [sic] accounts" for Edward Jones. Defense Counsel asked her, "So you are financial?" Bell answered "Yes." Defense Counsel then asked her: "So things add up?" Bell answered "Yes."

Upon the State's striking of Bell, Defense Counsel timely objected and made the showing necessary under *Parker* to require the State to provide a race-neutral explanation for the strike. In response, the State provided the following explanation for striking Bell:

> My reason for striking [Bell] is based on her employment. It wasn't until [Defense Counsel] asked her specifically what she did for Edward Jones was that [sic] she deals with things in the financial area. She said things that add up. She deals with numbers, and I'm striking her for that cause, because this case is not only a circumstantial case, the case is based on testimony of people related to the defendant. And there may be things that don't add up. I think someone who deals with numbers in that—that way, may have a problem making a leap if things don't add up to her. That would be my race-neutral reason, your Honor.

Defense Counsel then challenged the State's reason, stating that "Ms. Grogan is comparable to her. Number 23, she was a collector. She basically was sort of an auditor, and he didn't strike her." The State then responded to Defense Counsel's challenge by stating that "[a] collector I would take to be someone who has the bills, brings in the bills. I don't see where she is adding anything up." At this point, the trial court ruled that it found the State's reason to be a race-neutral reason for striking Bell, and the objection to the strike was denied.

On appeal, Hopkins specifically argues the trial court erred in overruling his challenge to the strike of Bell because the reasons given by the State for striking Bell from the venire panel were mere pretext for removing her because she is African–American. During voir dire, Defense Counsel made a timely objection to the State's proffered reason for striking Bell as mere pretext. In support of this objection, Defense Counsel offered that there was a similarly situated white juror who was not struck, the first factor to be considered in determining pretext. Defense Counsel argued that Venireperson Grogan, a white juror who was employed as a collector, was similarly situated and that the State should have the same concerns about Grogan's employment as Bell's. The State's efforts to distinguish these two jurors' employment by stating that a collector "brings in the bills," not "add[s] things up," is not persuasive. Similarly to Bell, as a collector, Grogan would also be responsible for making sure that the collected funds and the bills add up, i.e., that they reconcile. Thus, as to the first factor to be considered when determining pretext, we find that there was a similarly situated white juror who was not struck.

We find the State's reason for striking Bell, that she deals with things in the financial area and may therefore have a problem if things don't add up, to be disingenuous. The State alleged that the case was circumstantial and based upon testimony of people related to the defendant, therefore there may be things that don't add up. We disagree. This case is primarily based on evidence directly linking Hopkins to the crimes. Here, both Robin and Nunley recognized and identified Hopkins at trial as the person who broke into Nunley's bedroom on the morning the crimes were committed. Also, there was witness testimony of an admission by Hopkins that he was at Nunley's house when the crimes were committed. Therefore, as to the second factor to be considered in determining pretext, the degree of logical relevance between the proffered explanation and the case to be tried, we find that there was no logical relevance between Bell's employment reconciling accounts and the case at hand.

As to the third factor to be considered, the prosecutor's credibility, based upon the court's past experiences with the prosecutor and the prosecutor's demeanor or statements made during voir dire, we are not in a position to know of the trial court's past experiences with the prosecutor or to assess the prosecutor's demeanor. However, we do find that the prosecutor's questioning during voir dire did not support his subsequent reasoning for wanting to strike Bell. The prosecutor stated that he was striking Bell because her employment involved "adding things up." Nevertheless, it was Defense Counsel who asked Bell about her employment, not the prosecutor. Further, the prosecutor failed to ask any follow-up questions of Bell, or focus any of his questioning on whether any of the other venirepersons' employment involved "adding things up." Thus, if "adding things up" was important to the prosecutor, he would have asked questions necessary to determine if any of the other

venirepersons' employment involved such activity. Because the prosecutor did not ask those questions, his behavior is inconsistent with his stated reasoning for striking Bell.

As to the fourth factor, the demeanor of the excluded venirepersons, there is nothing on the record which indicates that Bell was not able to serve as a fair and impartial juror.

As stated above, the totality of the facts and circumstances surrounding a case should be taken into consideration when determining pretext. *See Marlowe*, 89 S.W.3d at 470. Here, after considering all of the facts and circumstances surrounding this case, we believe the State's proffered reason for striking Bell from the venire panel was merely pretextual and as a result, based upon the applicable standard of review, a mistake was made in allowing the State to utilize a peremptory strike to remove Bell from the venire panel. *See Davis*, 894 S.W.2d at 707.

### B. *Juror Number 14 (Acklin)*

 Next, Defense Counsel challenged the strike of juror number fourteen, Christoper Acklin ("Acklin"), and made the showing necessary under *Parker* to require the State to provide a race-neutral explanation for the strike. In response, the State provided the following explanation for striking Acklin:

Mr. Acklin lists his marital status as divorced. This case will involve testimony about marital infidelity. There will be testimony that the defendant had a child out of wedlock. There will be testimony that his wife, Ms. Hopkins, was sleeping with the victim, Mr. Nunley. Because of that, I'm uncomfortable with him being on the jury.

Defense Counsel then challenged the State's reason for striking Acklin by stating that, "I believe there are three other

people that are divorced on the panel[,] ... [s]o I would say there is a similarly situated [white] person he didn't strike, Angela Steiner." The State then responded to Defense Counsel's challenge by stating that, "I would point out that Ms. Steiner, Angela Steiner, has no children, and Mr. Acklin indicated he does have one child."

At this point, the court intervened and the following discussion took place:

THE COURT: I think given the nature of this particular case, that it does involve a situation between an estranged husband and wife, where I gather there was a divorce pending, is this correct, contemplated divorce?

[THE STATE]: That's my understanding, Judge.

THE COURT: And a child is involved, and the [c]ourt also notes that it is my understanding that the victim and a number of the State's witnesses are African–American.

[THE STATE]: Correct.

THE COURT: Based upon all of the circumstances and the observations of this particular panel member by the Court, and the reason articulated by counsel, ... the objection to panel member number 14 will be denied.

On appeal, Hopkins specifically argues the trial court erred in overruling his challenge to the strike of Acklin because the reasons given by the State for striking Acklin from the venire panel were mere pretext for removing him because he is African–American. During voir dire, Defense Counsel made a timely objection to the State's proffered reasons for striking Acklin as merely pretextual. In support of this objection, Defense Counsel offered that there were several other venirepersons who were divorced and specifically offered Venireperson Steiner as a similarly situated white juror who was not struck,

the first factor to be considered when determining pretext.

The State alleged that the case was going to involve testimony about marital infidelity, the defendant having a child out of wedlock and Robin sleeping with the victim. The State claimed to be uncomfortable with Acklin being on the jury because he was divorced. However, divorce alone is not an indication of marital infidelity. Therefore it is not clear to us why Acklin's divorced status is relevant to this case.

The State attempted to distinguish Acklin and Steiner by stating that Acklin had children and Steiner did not. Again, the State failed to identify the logical relevance between a venireperson having children and the case at hand, the second factor to be considered in determining pretext. Thus, it is not clear to us how simply having children is relevant to this case. The trial court, nevertheless, erroneously allowed the State to strike Acklin without requiring it to justify its distinction between the two venirepersons. Rather, as set out above, the trial court justified the strike by making its own statements in support of it.

Further, the State failed to ask Acklin or any of the other jurors any questions regarding their marital status or children and depended solely upon the juror information sheets for such information. Therefore, it was unknown whether Acklin and his ex-wife were estranged, whether there was any marital infidelity between them, or whether any of the other jurors were estranged from their wives or husbands, experienced any marital infidelity, or had any children in or out of wedlock. As a result, we find that there was a similarly situated white juror who was not struck and that the State failed to show the logical relevance between Acklin being

divorced or having children, and the case at hand.

The justification offered by the trial court also fails to show any logical relevance to the case. The trial court's justification for allowing the strike of Acklin was that this case involved a situation between an estranged husband and wife and a pending divorce, where a child was involved and where "the victim and a number of the State's witnesses are African[-]American." These facts are entirely irrelevant to a determination of whether Hopkins committed the alleged assault and burglary against the victim in this case. These comments by the court only serve to confirm our belief that a mistake was made in allowing the strike of Acklin.

As to the third factor to be considered in determining pretext, again we are not in a position to know of the trial court's past experiences with the prosecutor or to assess the prosecutor's demeanor. However, as in the case of Venireperson Bell, we do find that the prosecutor's questioning during voir dire did not support his subsequent reasoning for seeking to strike Acklin. As stated above, the prosecutor relied solely upon the juror questionnaire and failed to even ask Acklin if he was divorced, and if so, whether his divorce was due to marital infidelity or whether or not his children were born outside of his marriage. Also, the prosecutor failed to ask anyone else on the venire panel if they were divorced, or like Hopkins, on the verge of divorce, or whether any of them had children or experienced any marital infidelity. Thus, not only is the peremptory strike not logically relevant to this case, the prosecutor's behavior is inconsistent with his stated reasoning for striking Acklin.

As to the fourth factor, the demeanor of the excluded venirepersons, there is nothing on the record which indicates that

Acklin was not able to serve as a fair and impartial jury member.

Based upon the applicable standard of review, and after considering all of the facts and circumstances surrounding this case, we believe that the State's proffered reason for striking Acklin from the venire panel was merely pretextual and that a mistake was made in allowing the State to utilize a peremptory strike to remove him from the venire panel. *See Davis,* 894 S.W.2d at 707.

### C. *Juror Number 28 (Owens)*

 Next, Defense Counsel challenged the strike of juror number twenty-eight, Jared Owens ("Owens"), and made the showing necessary under *Parker* to require the State to provide a race-neutral explanation for the strike. In response, the State provided the following explanation for striking Owens:

> Based on the fact [that] he knows La-Rhonda Burse, who is a criminal defense attorney, [and] he is the only one on the panel that says he knows a criminal defense attorney. *For him to volunteer that,* he says he is an account manager and[sic] sales with Charter. *For all of the people he is in contact with, to say her name makes me feel there is more to the relationship than just a base relationship.* Based on that, I'd ask he be struck.

(Emphasis added). Then the following exchange took place:

> [DEFENSE COUNSEL]: I'd like the [c]ourt to take judicial notice [of] the fact that LaRhonda Burse is a flamboyant African–American attorney. I don't think that is a race-neutral reason.
>
> [THE STATE]: He also stated he is good friend[s] with Judge Hemphill and went to church with Judge Hemphill. I would like the [c]ourt to know Judge

Hemphill appears to be African–American to the State.

> [THE COURT]: [Owens] indicated[,] in my notes[, that] he talked to her[, La-Rhonda Burse,] about cases, and that the relationship was, as Mr. Smith stated, more than just an acquaintance. So based upon that, the [c]ourt finds there is a race-neutral basis for the strike of panel member number 28.

As to the first factor to be considered when determining pretext, whether there were similarly situated white jurors who were not struck, here, several other white panel members stated that they had relationships with persons in the "criminal justice service" when asked by the State.

Venirepersons Connors and Koeln, both white panel members who were not struck, answered that they knew attorneys or were acquainted with attorneys and that they have talked to them about what they do. Thus, as to the first factor to be considered when determining pretext, we find that there were similarly situated white jurors who were not struck.

As to the second factor to be considered in determining pretext, the degree of logical relevance between the proffered explanation and the case to be tried, the State failed to show the logical relevance between its proffered explanation for striking Owens and the case at hand. The State's proffered explanation for striking Owens incorporates and relies on the nature of his relationship with a criminal defense attorney. Thus, its reason was not simply that Owens knew a criminal defense attorney, but that there was more to the relationship than "just a base relationship." This explanation, however, is not supported by the record.

Here, the State argued that Owens volunteered the information that he knew La-Rhonda Burse and suggested that he simply named her without solicitation. On the

contrary, according to the transcript, the State specifically requested this information from Owens. The State asked as a blanket question to the entire panel, "does anyone here have a family member or a close friend, or friend that is in the criminal justice service ... ?" Owens responded that LaRhonda Burse was a client of his at Charter Communications. The following discussion regarding LaRhonda Burse took place as a result.

[THE STATE]: Ms. Burse, do you know she is a criminal defense attorney?

[OWENS]: Yes.

[THE STATE]: Do you talk to her about what she does?

[OWENS]: Sure.

[THE STATE]: What do you talk to her about?

[OWENS]: Mainly just her role as an attorney. She doesn't really get into any specifics about her clients and the cases.

[THE STATE]: Would any of those discussions with Ms. Burse cause you to have an opinion about the prosecutors or the prosecution or the State?

[OWENS]: No.

[THE STATE]: Would it cause you to have any opinions about defense attorneys or defendants?

[OWENS]: I wouldn't say so.

[THE STATE]: When you say you wouldn't say so, is there—

[OWENS]: I wouldn't form an opinion before hearing the witnesses.

[THE STATE]: You wouldn't form an opinion before you heard the evidence?

[OWENS]: Correct.

[THE STATE]: Is there anything in the back of your mind you are going to be thinking, as you hear it, are you going to be thinking how you might not believe the State's witnesses over the defense's witnesses?

[OWENS]: No.

According to the transcript, Owens stated that LaRhonda Burse had only discussed "her role as an attorney," and that she "[didn't] really get into any specifics about her clients and the cases." There is nothing in Owens's voir dire testimony that indicates that he shares a relationship with LaRhonda Burse that is any more substantial than the relationships held by other white venirepersons with individuals involved in the criminal justice system. Several white venirepersons gave the same answers as Owens when asked about discussions with their acquaintances in the criminal justice system and were not struck for that reason. Therefore, the State's explanation fails to show the logical relevance to the case to be tried and fails as race-neutral.

As to the third factor to be considered, the prosecutor's statement during voir dire that Owens's relationship with LaRhonda Burse "is more than just a base relationship" is inaccurate considering Owens's actual voir dire testimony. The State mischaracterized Owens's relationship with LaRhonda Burse as more than a "base relationship," and the trial court misstated Owens's comments about discussing LaRhonda Burse's cases with her.

Additionally, there were discrepancies in the way the State dealt with Owens and some of the other white venire panel members. When Owens answered that he knew LaRhonda Burse, and that he talked with her about what she does, the State's follow-up question was, "What do you talk to her about?" Whereas, when Venirepersons Connors and Koeln, both white venire panel members who were not struck, answered that they knew attorneys or were acquainted with attorneys and that they talked with them about what they did, the State's follow-up questions were, "Is that

going to effect you in any way?" and, "Could you still be fair and impartial to the defendant?" The prosecutor never asked the names of those attorneys or what kind of work they did, nor did he ask what these venirepersons talked to them about.

Furthermore, when Defense Counsel challenged the State's reason as not being race-neutral by pointing out that LaRhonda Burse is African–American, the State declared that Owens is also good friends with Judge Hemphill, who he attends church with, and who "appears to be African–American to the State." The fact that Owens is associated with an African–American attorney and an African–American judge is irrelevant to Owens's ability to be fair and impartial. On the contrary, once again, the State's emphasis on race tends to support our conclusion that a mistake was made.

As to the fourth factor, the demeanor of the excluded venirepersons, there is nothing on the record that indicates that Owens was not able to serve as a fair and impartial juror member.

Based upon the applicable standard of review, and after considering all of the facts and circumstances surrounding this case, we believe that the State's proffered reason for striking Owens from the venire panel was merely pretextual and that a mistake has been made in allowing the State to utilize a peremptory strike to remove him from the venire panel. *See Davis*, 894 S.W.2d at 707.

## D. *Other Minority Jurors*

As stated above, in making a determination as to pretext, the trial court should consider the totality of the facts and circumstances surrounding a case. *See Marlowe*, 89 S.W.3d at 470. Thus, although Hopkins is not challenging the strikes of Venirepersons Gomez–Solis and Lane, considering the totality of the facts and cir-

cumstances surrounding this case, the State's decision to strike these minority jurors is relevant to our determination as to whether pretext was involved here.

### 1. *Juror Number 16 (Gomez–Solis)*

The State attempted to strike juror number sixteen, Juan Gomez–Solis ("Gomez–Solis"), the only Hispanic venireperson on the panel, but the trial court rejected this strike. Defense Counsel challenged the strike of Venireperson Gomez–Solis and made the showing necessary under *Parker* to require the State to provide a race-neutral explanation for the strike. In response, the State provided the following explanation for striking Gomez–Solis:

> My reason for striking ... [Gomez–Solis] is that during my questioning of him in voir dire, he never answered a question, and I think during ... [Defense Counsel's] questioning, he only spoke about what he did as a training tech. He went into that a little bit. I'm striking him. He didn't answer any of my questions. I know very little about him. I'm not comfortable with him being on the jury.

Defense Counsel then challenged the State's reason, stating that "there are a number of people who didn't speak up." The court responded by stating that "I believe that's an inadequate reason to strike panel member number 16, under the circumstances." The State responded that "[t]he fact that he didn't answer any of my questions, I wouldn't be comfortable with him, is not a race-neutral reason?" The court responded,

> There are other people on the panel that didn't answer questions. My recollection is you didn't direct a question particularly to him. He didn't volunteer an answer to any of your questions. So that being the case, all you are really

saying to me, [is that] you are not comfortable with him. I don't think that's an adequate reason. So I'm going to set aside the strike of panel member number 16.

Thus, in determining whether the State used pretext to strike several African-American jurors, we must consider this failed attempt by the State to use one of its peremptory strikes on a minority venireperson.

### 2. *Juror Number 20 (Lane)*

The State also struck African-American venireperson, juror number twenty, Jason Lane ("Lane"), from the venire panel. Defense Counsel challenged the strike of Venireperson Lane and made the showing necessary under *Parker* to require the State to provide a race-neutral explanation for the strike. As to this venireperson, the State provided a race-neutral explanation for the strike that was acceptable to the trial court. However, the State added a second reason for the strike that the court found to be non-race-neutral. The State provided the following explanation for striking Lane:

Basically, your Honor, a couple of reasons, one being again this person didn't answer any of my questions or didn't volunteer any answers to my questions during my portion of the voir dire. He was the last one to get here. When [we] reconvened after lunch, I think the ba[i]lliff had to find him in the hallway and bring him back. During Mr. Rigel's voir dire, I saw him sleeping. So based on that, it is the State's position [that] he is not interested in being here by the fact that he was tardy, by the fact [that] he was sleeping, and also I'm not comfortable with him being on the jury with those reasons—for those reasons, *and I object to the way he is wearing his hair. Judge, I think based on some of the testimony that may come out in this trial, he may be biased toward one side or the other. As the [c]ourt correctly pointed out, all of the witnesses in this case are African[-]American on both sides, the State and the defense, except for the doctor, who treated the victim in this case.*

(Emphasis added). The court responded as follows:

Counsel, let me say this, I don't think [that] it is a race-neutral reason that you don't like the way someone is wearing their hair. I don't think that's a basis; however, I also noticed him appearing to be sleeping at one point, and I think that is a basis—a race-neutral basis to strike a panel member. So setting aside your comment about his hair, the [c]ourt finds that his inattentiveness and appearing to be sleeping is a race-neutral reason to strike panel member number 20, and the objection to that strike will be denied.

After the court made its final ruling on the objection to Lane being struck, the State continued to make the following argument:

Judge, I guess it doesn't matter since the [c]ourt has made that record that they are going to go ahead and uphold the State's strike. There is a case specifically on point that where the prosecutor made an objection based on the facial hair. My objection is based on the way he is wearing his hair. *No one else in the jury is wearing his hair in that manner. I made it based on that.*

(Emphasis added). The court responded, "I'm saying to you [that] I don't find that to be a persuasive reason[.] I'm setting that aside, whether there is a case on point or not[, and] I'm not considering that[,] [b]ut ... the inattentiveness and appearing to be sleeping ... that's a race-neutral basis to strike that juror."

Therefore, although the State provided a race-neutral reason for striking Lane, it was tainted by the State's additional reason, Lane's hairstyle, which, due to the prosecutor's injection of race, was non-race-neutral. We will consider the State's offer of a non-race-neutral reason to strike a minority venireperson in our determination as to pretext.

Both the State's failed attempt to strike minority Venireperson Gomez–Solis and its persistent attempt to rely on a non-race-neutral reason for strike of minority Venireperson Lane, are facts that we have considered in our review of the trial court's denial of Hopkins's *Batson* challenge to the State's peremptory strikes of minority Venirepersons Bell, Acklin and Owens. These attempts shed some light on the prosecutor's demeanor and credibility. As a result, after considering all of the facts and circumstances surrounding this case and our standard of review, we find a mistake was made in allowing the State to utilize peremptory strikes to remove Venirepersons Bell, Acklin and Owens from the venire panel because its reasons were merely pretextual. *See Davis,* 894 S.W.2d at 707. Point I is granted. We reverse and remand for a new trial. While our resolution of Point I is dispositive of the appeal, because the issues raised in Hopkins's Points II & III may arise on retrial we will address them here.

## II. *Armed Criminal Action*

▮ In his second point on appeal, Hopkins argues the trial court erred by overruling his motions for judgment of acquittal and sentencing him upon his conviction of ACA in connection with the underlying felony of burglary in the first degree because the State failed to present evidence necessary for a jury to find a "subjective state of near certitude" that he committed burglary "by, with or through the use of a dangerous instrument." Specifically, Hopkins argues that the State failed to present any evidence that could prove that he committed the offense of burglary in the first degree with the use of a dangerous instrument. We agree.

▮ In reviewing the sufficiency of the evidence to support a conviction, we consider the evidence and all reasonable inferences therefrom in a light most favorable to the verdict. *State v. Carpenter,* 109 S.W.3d 718, 721 (Mo.App. S.D.2003). We consider whether the evidence was sufficient to make a submissible case from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes charged. *Id.*

[A] person commits ACA in connection with burglary ... if he or she uses a dangerous instrument or deadly weapon either to effectuate unlawful entry to a building or for the purpose of committing the denominated crime therein; the crime of ACA is committed in a burglary setting if the weapon or instrument *is used to gain entry* for the purpose of committing a crime therein.

*Id.* at 723 (emphasis added). In *Carpenter,* the defendant broke into the victim's house by breaking out the glass in the back door and kicking the door open. *Id.* at 720. The defendant was charged with ACA, with first-degree burglary as the underlying crime. *Id.* In that case, the dangerous instrument that was used to commit the assault was a rifle, which was identified by the victim and recovered at the scene. *Id.* at 720. In reversing the trial court's conviction on the ACA charge, the court reasoned that because of the way the defendant was charged, he had completed first-degree burglary upon his unlawful entry into the victim's house with the intent to assault her. *Id.* at 723, 724. Therefore, the court concluded, in order for the defendant to have committed ACA

in the course of committing the first-degree burglary, "he must have gained entry 'by, with or through the use, assistance, or aid of' the rifle," most likely by either shooting the door open or by holding the victim at gunpoint and demanding that she open the door. *Id.* at 723; *see also State v. Dudley*, 51 S.W.3d 44, 52 (Mo.App. W.D. 2001) (holding that where the only evidence of entry into the house was that the door was kicked open, there was nothing in the record from which a reasonable jury could infer that unlawful entry was had "by, with, or through the use, aid, or assistance of the gun" used to injure the victim).

In the case at hand, the jury instruction on the charge of burglary in the first degree read as follows:

> First, ... the defendant knowingly entered unlawfully in an inhabitable structure, ... and
>
> Second, that defendant did so for the purpose of committing the crime of assault therein, and
>
> Third, that while the defendant was in the inhabitable structure Byron Nunley ... [was] present ... and [was] not a participant[ ] in the crime, then you will find the defendant guilty under Count I of burglary in the first degree.
>
> . . . .

Thus, as the crime was charged here, Hopkins completed the crime of first-degree burglary upon his unlawful entry into Nunley's occupied home with the intent to assault him.

The jury instruction on the charge of ACA in connection with the underlying felony of burglary in the first degree read as follows:

> First, that defendant committed the offense of burglary in the first degree, as submitted in ... [the jury instruction on the charge of burglary in the first degree], and

Second, that defendant knowingly committed that offense by or with or through the use of a dangerous instrument, then you will find the defendant guilty under Count II of armed criminal action.

As used in this instruction, the term "dangerous instrument" means any instrument, article, or substance which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury.

. . . .

Therefore, a finding that Hopkins gained entry "by or with or through the use of a dangerous instrument" is necessary to find that he committed ACA in the course of committing the first-degree burglary that was charged here.

The only evidence to support a finding that any instrument may have been used to gain entry into Nunley's house was Nunley's testimony. Nunley testified that in order to get into the bedroom where he was attacked, one would have to gain entry through four different doors. The first door was the door into the garage at the side of the house, which he stated was kicked open, the second door was the door leading from the garage into the house, which he stated was pried open, the third door was the door leading from the upper level of the house to the basement, which he stated was pried open, and the fourth door was the door leading directly into Nunley's bedroom, which he stated may have been opened by hand.

However, unlike in *Carpenter* and *Dudley*, here, the dangerous instrument was never seen, identified or recovered. Neither the sharp object used to injure Nunley, nor any instruments or sharp objects that might have been used to pry open any of the doors necessary to gain entry into

Nunley's bedroom were identified by any witnesses or recovered by the police.

While there was sufficient evidence that a dangerous instrument was used to commit the assault, evidence of its use to commit the burglary is virtually non-existent. There was no evidence of scratches, scrapes, marks or tears at any of the doorways. The "dangerous instrument" was never seen, described, recovered or referred to by any witness. Nunley only offers that one or two of the doors necessary to gain entry into his bedroom were "pried open." This prying may very well have been accomplished without any instrument based upon the scant testimony presented here. In addition, the photos of the scene, taken on the night of the incident, were lost, and the investigating officers are unable to recall any images from the scene.

Based upon the facts presented here, as well as the charge, evidence of the completed first-degree burglary does not tend to prove that *any* instrument was used to gain entry into Nunley's home. As stated above, the crime of first-degree burglary, as charged in this case, was completed upon unlawful entry into Nunley's occupied home. Therefore, the events that occurred subsequent to that unlawful entry are not relevant to a determination of whether ACA in connection with the underlying felony of first-degree burglary, as charged, was committed here. Where the instrument was never seen, described or recovered, evidence of the stabbing alone does not tend to prove that the instrument used to injure Nunley was used to gain entry into Nunley's home. Under the circumstances in this case, there is no proof that the sharp object used to injure Nunley was not obtained inside the residence. It is mere speculation to assume that the sharp object used to assault Nunley was also used to gain entry into his home.

Thus, we find that it was not possible for the evidence to show that beyond a reasonable doubt, Hopkins gained entry "by or with or through the use of a dangerous instrument," as necessary in this case for him to have been found guilty of ACA in connection with the burglary charged against him in this case. For the foregoing reasons, it was error to convict Hopkins of ACA in connection with the underlying felony of burglary in the first degree charged here. Point II is granted.

### III. *Confidential Communications Marital Privilege*

 In his third point on appeal, Hopkins argues the trial court abused its discretion in allowing the State to introduce evidence of his conversation with Robin because it was a violation of his Fifth and Fourteenth Amendment rights to due process, in that he intended the conversation to be private, and therefore it was inadmissible as a confidential communication between husband and wife.

 Under Missouri law, a spouse may testify against the defendant spouse in a criminal action at the testifying spouse's option, provided no confidential communications are disclosed. Section 546.260, RSMo 2000. The marital privilege prohibits testimony concerning statements privately communicated between spouses during their marriage. *Id.; State v. Moore*, 882 S.W.2d 253, 262 (Mo.App. E.D.1994), *cert. denied*, 513 U.S. 1130, 115 S.Ct. 942, 130 L.Ed.2d 886 (1995). "This privilege is intended to encourage full disclosure and trust between the parties to a marriage." *State v. Byrd*, 676 S.W.2d 494, 501 (Mo. banc 1984), *cert. denied*, 469 U.S. 1230, 105 S.Ct. 1233, 84 L.Ed.2d 370 (1985).

Here, the trial court ruled that the marital privilege did not apply to Robin's testimony about a conversation between her

and Hopkins after the alleged crimes were committed. The trial court stated that there was a question about whether or not a marital relationship existed *per se* at the time that this communication took place because Hopkins and Robin were separated and living apart, and because Robin was living with another man. We agree.

Although Missouri state courts have not addressed whether or not marital privilege applies to permanently separated married couples or to married couples who no longer have a marital relationship, as is the case here, the Eighth Circuit Court of Appeals has. In *United States v. Jackson*, 939 F.2d 625, 627 (8th Cir.1991), the Eighth Circuit Court of Appeals held that the marital "privilege does not protect information communicated after the couple has permanently separated." The court reasoned that the defendant was not entitled to invoke the privilege, although he and his wife were not divorced, where the couple was "permanently separated without any semblance of marital relationship at the time of the communication." *Id.*

Likewise, in *United States v. Frank*, 869 F.2d 1177, 1179 (8th Cir.1989), *cert. denied*, 493 U.S. 839, 110 S.Ct. 121, 107 L.Ed.2d 82 (1989), the Eighth Circuit decided that the defendant spouse was not entitled to invoke the marital privilege, although he was still legally married to his wife at the time of the communication. In *Frank*, the defendant and his wife were separated and the wife had filed for divorce and moved out of state. *Id.* at 1178. During their separation, and before their divorce was final, in a telephone conversation with his wife, the defendant threatened to "deal with" the trial court judge who presided over their divorce proceedings. *Id.* Two days later, that trial judge's home was set fire to and the defendant was charged with conspiracy and arson. *Id.* At trial, the defendant's wife was al-

lowed to testify about the conversation she had with him stating that he would "deal with" the trial judge. *Id.* The defendant was convicted and subsequently challenged on appeal the district court's admission of the evidence of the conversations he had with his wife because they were confidential and protected by the marital privilege. *Id.* In denying the defendant's claim of error, the court reasoned that "privileges are disfavored because they impede the search for truth," and due to the permanent separation of the couple and their "defunct" marriage, the defendant was not entitled to invoke the privilege. *Id.* at 1179.

Similarly, in *United States v. Brown*, 605 F.2d 389, 396 (8th Cir.1979), *cert. denied*, 444 U.S. 972, 100 S.Ct. 466, 62 L.Ed.2d 387 (1979), the court held that the marital privilege is "not absolute," and that it was not applicable under the circumstances in that case. In *Brown*, although the defendant was still legally married, his wife was only with him for two weeks before he left her. *Id.* The wife had not seen the defendant for the entire eight months between his leaving and the date of his criminal trial for interstate commerce violations. *Id.* The court did not apply the privilege, finding that the wife's testimony was devoid of interspousal communications and that the record failed to indicate any injury to privilege-protected values. *Id.* The court reasoned that "[p]rivileges are impediments to the search for truth, finding their justification in the priority of societal values they serve[, and t]he higher-than-truth value served by the privilege before us is the protection of the marital bond." *Id.* The court further reasoned that "it is difficult to visualize how preservation of that value would have required the total exclusion of [the defendant's wife] from the witness stand." *Id.*

Just as in *Jackson* and *Frank*, here, there was no "semblance of any marital

relationship" between Hopkins and Robin at the time of the communication at issue and their marriage was essentially defunct. Hopkins and Robin were married in September of 1989. In 1999, Hopkins fathered a child outside of their marriage. Hopkins and Robin attempted to reconcile over the next two years, but eventually separated in August of 2001. Robin started dating Nunley in September of 2001 and shortly thereafter moved in with him. Robin testified that the only reason she had not yet divorced Hopkins was because she lacked the financial means to do so, showing that the separation was intended to be permanent. Therefore, taking all of the above facts and circumstances into consideration, we agree with the trial court that Hopkins was not entitled to invoke the marital privilege to prevent Robin from testifying about Hopkins's communication with her regarding his presence at the scene of the crimes in this case. Point III is denied.

In conclusion, after considering all of the facts and circumstances surrounding this case and our standard of review for Point I, we find that a mistake was made in allowing the State to utilize peremptory strikes to remove Venirepersons Bell, Acklin and Owens from the venire panel because its reasons were merely pretextual. Therefore, we reverse and remand this case for a new trial in conformity with this opinion.

REVERSED AND REMANDED FOR A NEW TRIAL.

LAWRENCE G. CRAHAN, J., concurs in result as to Point I, concurs as to Points II and III.

PATRICIA L. COHEN, J., concurs.