**STATE of Missouri, Plaintiff–Respondent,**

v.

**Lee HARRELL, Defendant–Appellant.**

**No. SD 30312.**

Missouri Court of Appeals,
Southern District,
Division One.

June 23, 2011.

Alexa I. Pearson, Columbia, MO, for Appellant.

Chris Koster, Attorney General, and, Jamie Pamela Rasmussen, Assistant Attorney General, Jefferson City, MO, for Respondent.

DON E. BURRELL, Judge.

A jury found Lee Harrell ("Defendant") guilty of committing the class B felony of first-degree burglary and the unclassified felony of armed criminal action ("ACA") by unlawfully entering a church (with the purpose to commit stealing) while armed with a deadly weapon. *See* sections 569.160 and 571.015.[1] The alleged deadly weapon was a metal replica of the "Sword of Narnia" (the "replica sword") that had been won by children as a carnival prize.[2] The trial court sentenced Defendant to serve twenty-five years in the Department of Corrections: ten years for burglary running consecutively to fifteen years for ACA.[3]

Defendant's three points on appeal challenge the classification of the replica sword as a deadly weapon, the sufficiency of the evidence to prove that it was used during the commission of the burglary, and the language of verdict-directing instruction for ACA. Finding no merit in any of Defendant's claims, we affirm.

---

1. All statutory references are to RSMo 2000. Under section 569.160:

   A person commits the crime of burglary in the first degree if he knowingly enters unlawfully or knowingly remains unlawfully in a building or inhabitable structure for the purpose of committing a crime therein, and when in effecting entry or while in the building or inhabitable structure or in immediate flight therefrom, he or another participant in the crime:

   (1) Is armed with explosives or a deadly weapon or; [sic]

   (2) Causes or threatens immediate physical injury to any person who is not a participant in the crime; or

   (3) There is present in the structure another person who is not a participant in the crime.

   Section 571.015 provides that a person commits the crime of ACA if he commits a felony "by, with, or through the use, assistance, or aid of a dangerous instrument or deadly weapon[.]" For purposes of ACA, the original information charged the burglary as a second-degree burglary. An amended information was filed during trial, revising the ACA charge to state "the felony of Burglary 1st" as the underlying offense.

2. The replica sword was apparently inspired by a movie based on THE CHRONICLES OF NARNIA book series written by C.S. LEWIS.

3. Defendant's sentence also stated that he was "committed to the **Court Ordered Long Term Substance Abuse Program (§ 217.362)**." (Bold-type as in original). The Department of Corrections deemed Defendant ineligible for long-term treatment based on his ACA conviction, which carries a mandatory minimum sentence of three years.

## Facts

The following is a recitation of the evidence as viewed in the light most favorable to the verdicts and disregards all contrary evidence and inferences. *See State v. Grim*, 854 S.W.2d 403, 411 (Mo. banc 1993). On June 21, 2009, Defendant was visiting friends at Robin Johnson's home in Rolla. At some point, Defendant left the home and later returned. When Defendant returned, he alarmed Johnson by walking into her house without her having let him in. Defendant grabbed the replica sword Johnson's sons had won at a carnival and took it with him from the home, stating that somebody "was trying to kill [him]." Johnson did not give Defendant permission to take the replica sword.

Johnson stated that after her sons had won the replica sword, she "would bring it down, and [the children] looked at it. They never played with it. It's not—that's not really what it was for." She testified that the replica sword was "not something that you want your kids to actually play with. I kept it up over the stove, and we have neighborhood kids come over, and I know how kids are." Johnson also testified that she would not want children to play with it "[b]ecause it probably hurts, you know, if they weren't careful with it."

After Johnson identified the replica sword as the "Sword of Narnia" Defendant had taken from her home, it was received into evidence as State's Exhibit 1 and passed to the jury. Johnson noted that the replica sword was now "all banged up, scratched up" and had not been in that condition when Defendant took it from her home. Johnson described the replica sword as approximately 22 inches long and silver in color. A friend of Johnson's reported Defendant's theft of the replica sword, and a police officer eventually brought it back to her home "probably around midnight or a little after" and asked if she could identify it.

Thomas Davis, a Rolla police officer, had recovered the replica sword from the Tenth Street Baptist Church in Rolla. Officer Davis described the replica sword as a "sword" made of metal. Officer Davis went to the church to investigate a report that lights were going on and off inside the building. As Officer Davis walked north around the church, he "found glass and a screen lying on the ground." He observed that a basement window had been "busted out" and "there wasn't much glass left in the windowpane at all."

Other officers arrived and established a perimeter around the building. Officer Davis then heard something inside the church, and "[a] couple moments later, a head poked out the window and looked around like if [sic] they were looking to see if someone was there or not." Officer Davis immediately recognized Defendant and ordered him to show his hands. Defendant instead retreated back inside the church. Officer Davis continued to command Defendant to come out and show his hands. Eventually, Defendant came to the window with his hands up. Defendant was then instructed to come through the window. He did so and was taken into custody.

Upon entering the church, Officer Davis observed a box and a lunch cooler sitting on top of broken glass by the basement window. He observed a stereo in the middle of the floor "in [the] downstairs portion" of the building. Upstairs, the officer observed two offices and a sanctuary. The offices had "been gone through and papers laying all over the floor, drawers open stuff like that." Officer Davis observed a camcorder, videotapes, and a battery located between the two offices. In the sanctuary, "[a]ll of the audio equipment that was in the room had been pulled up away from

the wall and [was] kind of in a disarray. There [were] also tool marks on that door where it looked like someone had tried prying something in there to open the door up."[4] Officer Davis found the replica sword, along with a towel, in the sanctuary "a couple rows up on the right-hand side right under the end of a pew." When Officer Davis collected the lunch cooler, he discovered "a black Honeywell safe" and "a black pouch with loose change contained within it."

Officer Davis identified photographs taken of the broken window. Some showed views from the outside and others showed the scene from the inside. The photographs were admitted as Exhibits 6, 7, 8, and 9. Photographs depicting the replica sword were also admitted into evidence.[5] One of those photographs, Exhibit 34, showed "deep scratches on the very tip of the sword and the metal."

James Gregory Brown, the church's song-leader and a "key-holder" of the church, arrived at the scene. Brown went inside the church and observed that "[i]t looked like the building had been tossed, gone through." He testified that "[t]here was a glass broken out to the secretary's office" and a basement window was also broken. Brown did not know Defendant and had not given him permission to enter the church. Brown also did not know of anyone else who might have given Defendant permission to be inside the church at the time of these events.[6]

## Analysis

### Point I

■ Defendant's first point asserts the evidence adduced at trial was insufficient to prove that the replica sword met the statutory definition of a "deadly weapon" for purposes of first-degree burglary and ACA. Defendant characterizes the replica sword as "a Chronicles of Narnia movie replica sword, won by children as a prize at a carnival, it is metal but does not have sharpened edges and is not designed as a weapon[.]" He also refers to it as a "child's toy." The State concedes that to prove first-degree burglary it had to prove that Defendant was armed with a "deadly weapon," statutorily defined as "any firearm, loaded or unloaded, or any weapon from which a shot, readily capable of producing death or serious physical injury, may be discharged, or a switchblade knife, dagger, billy, blackjack or metal knuckles[.]" Section 556.061(10). The State also concedes that the only way the replica sword meets the statutory definition of deadly weapon is if it qualifies as a "dagger."[7]

4. Officer Davis also observed scratch marks "on the door that went to that office to the left," with "basically point marks where the glass had appeared it had been chipped like that." Additionally, Officer Davis observed marks on the door sill.

5. At the time of oral argument, only photographs of the replica sword had been included in the record on appeal. At our request, the replica sword was subsequently deposited and we have examined it. It has been said that a picture is worth a thousand words. *See* BARTLETT'S FAMILIAR QUOTATIONS 132 (15th ed.1980) (attributing the saying, "One picture is worth more than a thousand words" to an anonymous Chinese proverb). The same source attributes a similar quote, "A picture shows me at a glance what it takes dozens of pages of a book to expound" to Ivan Sergeyevich Turgenev, 1818–1883, at p. 564. While we do not claim to know the appropriate multiplier, we can say that having the object itself is better still.

6. Another key-holder of the church, David Keller, testified that the key-holders lock and unlock the church. Keller also testified that he had not given Defendant permission to be inside the church.

7. The jury instructions given by the trial court did not provide a definition for the term "deadly weapon." Defendant's first point

Defendant acknowledges that we must accept as true the evidence favorable to the verdict and disregard contrary evidence and inferences, *State v. Withrow*, 8 S.W.3d 75, 77 (Mo. banc 1999), but he also reminds us that we may not supply missing evidence or resort to unreasonable, speculative or forced inferences in support of the State's case, citing *State v. Whalen*, 49 S.W.3d 181, 184 (Mo. banc 2001). Statutory construction is a question of law, not fact, and we review it *de novo*. *State v. Payne*, 250 S.W.3d 815, 818 (Mo.App. W.D. 2008).

Defendant's argument is that the legislature could not have intended that "a movie replica sword won by children at a carnival" would fall within the statutory definition of a "deadly weapon."[8] Defendant notes that an actual sword is not included within the items listed as deadly weapons and argues that a replica (or model) of an unlisted item also cannot qualify as a deadly weapon, especially since criminal statutes must be construed strictly against the State, citing, for the latter proposition, *U.S. v. Boston & M.R.R.*, 380 U.S. 157, 160, 85 S.Ct. 868, 13 L.Ed.2d 728 (1965). Defendant argues that "[t]he legislature is aware of the difference between a 'sword' and a 'dagger,' and is aware of the difference between a weapon and a model or replica of one."[9]

While "dagger" is not defined in Chapter 561, *Payne*—a case cited by both parties—considered the meaning of "dagger" as used in section 556.061(10) in the context of a second-degree assault with a deadly weapon. 250 S.W.3d at 818. In *Payne*, the actual weapon used to stab the victim was not recovered and could not be described by either the eye-witnesses or by experts who had analyzed the wounds. 250 S.W.3d at 817–18. Because there was no description of the item used to stab the victim, the Western District held there

does not allege that the verdict director for first-degree burglary was erroneous in failing to include such a definition. The Notes on Use that accompany the model jury instruction for first-degree burglary, MAI–CR 3d 323.52 (10–1–98), state that the definition of "deadly weapon" may be included on the trial court's own motion and must be included upon the written request of the Defendant or the State. Note 2(b). Defendant does not claim in point one that such a definition was requested, and no objections by Defendant to the instructions or verdict directors were preserved on the record. Defense counsel argued the following definition to the jury:

The statute defines a deadly weapon as any firearm, loaded or unloaded, any weapon from which a shot readily capable of producing death or serious physical injury may be discharged or a switchblade knife, dagger, billy, blackjack or metal knuckles. That is how a deadly weapon is defined by statute. So what is up to you to decide is to whether that sword, which I'm not going to get out again, is a dagger (indicating).

8. Defendant maintains that "[t]he evident purpose behind the law [addressing burglary] is to increase the penalty for someone who puts an innocent person in harm's way during a burglary[,]" citing *State v. Washington*, 92 S.W.3d 205, 209 (Mo.App. W.D.2002). While such concern may well have influenced the legislature, neither the provision against burglary while armed with a deadly weapon nor the corresponding definition of deadly weapon expressly require that an innocent person be placed in harm's way or that the deadly weapon actually be used against a person.

9. As examples, Defendant points to section 70.441.3(11), regulating weapons in public facilities, that specifically lists "sword," but not "dagger," and section 571.010(1)(a), defining "antique firearm" to include a "replica thereof." We generally determine a statute's intent based upon the ordinary meaning of the words used in the statute, *Payne*, 250 S.W.3d at 820, and give each word meaning so that it is not redundant, *Id.* at 819, but that does not mean that an item falls from the reach of a particular statute simply because in common speech someone refers to an item with a different word than that used in the statute.

was no evidence that the weapon used was a dagger instead of some other short, sharp object such as scissors, a screwdriver, a shard of glass, or a switchblade knife. *Id.* at 821. It reversed the conviction for second-degree assault and remanded the case to the trial court with a directive that it sentence the defendant on the lesser-included crime of third-degree assault. *Id.* at 821–22.

In reaching its decision in *Payne,* the Western District considered the definition of "dagger" used by our high court in *State v. Martin,* 633 S.W.2d 80, 82 (Mo. banc 1982)—a "short weapon with a sharp point used for stabbing"—but determined that "[w]hile the definition was practical when applied to knives, it is overbroad when read without context of the particular factual situation to which it was applied." 250 S.W.3d at 821. It also stated that "[w]hile the definition of 'dagger' may be broad and encompass a huge variety of short, pointed weapons, it is not so broad as to encompass all items[ ] which could have reasonably caused the instant injuries. Both the structure of the statute and the ordinary meaning of the words used by the statute guide our conclusion." *Id.* at 818–19.

The Western District then set about to determine the ordinary meaning of the word "dagger" as illuminated by various dictionaries and concluded that "[t]he dictionary definitions provide only moderate guidance to the case at hand, some describe dagger broadly as any short, pointed or sharp weapon, while others limit dagger to knife-like weapons, longer than four inches, used for stabbing." *Id.* at 820. One dictionary included "a narrower definition, defining dagger as a 'short stout edged and pointed weapon, like a small sword, used for thrusting and stabbing.'" *Id.* (citing MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 290 (10th ed.1994)). The West-

ern District observed that "[d]ictionary definitions are not, however, the final source of guidance in statutory interpretation" and considered other historical and technical references, stating:

> Daggers may be described as falling into one or more specific varieties including poniard, dirk, facon, military-issued combat knifes, stilettos, or rondel. When these historical archetypes, as well as the dictionary definitions, are examined, several attributes repeatedly appear including a fixed or locking blade, with sharpened edges, shorter than a sword and longer than an ordinary pocketknife, ranging between 4 and 25 inches, hilt, and designed with the intent to be used primarily for stabbing during combat. Of course, not each of these characteristics must be present for a submissible case and a court ought not lightly take the issue out of the jury's prerogative.

*Id.* at 820–21.

Our examination of the replica sword reveals that it is made of solid metal and is 22 1/2 inches long when measured from the tip of its blade to the bottom of its hilt. The blade is 18 inches long. It weighs more than a pound. It has a sharp point and sharpened edges. When referring to the replica sword in closing argument, defense counsel stated, "It's a toy. It's heavy. It's pointy. It's still a toy. It's not a deadly weapon, and it's not a dagger." We disagree. The jury could readily determine that it had a hilt (or handle), a fixed blade, sharpened edges, and a sharp point. Whatever one chooses to call it, it meets the *Martin* description of "a short weapon with a sharp point used for stabbing" and satisfies most of the characteristics of a dagger set forth in *Payne.* 633 S.W.2d at 81, 250 S.W.3d at 820–21.

Defendant's argument that the replica sword was not designed or intended "to be used for stabbing during combat" or as a

weapon misses the mark. In contrast to its decision to define what constitutes a "dangerous instrument" by the manner in which the item is used, the legislature chose to determine what constitutes a deadly weapon by setting forth a list of specific items. Whether an item constitutes a deadly weapon does not depend upon either its intended or actual use by the defendant. *Payne*, 250 S.W.3d at 819; *State v. Williams*, 126 S.W.3d 377, 384 (Mo. banc 2004) (a deadly weapon is inherently dangerous, not just dangerous because it is used in a particular way); *State v. Jennings*, 887 S.W.2d 752, 755 (Mo.App. W.D.1994) (defendant's argument that he did not intend to use a gun to harm the victim did not remove the gun from the classification of a deadly weapon).

We believe the State correctly argues that *Payne* does not "delineate the exact combination of characteristics necessary to define a dagger" and anticipated that the issue would be submitted to the jury for its determination even when the item in question did not meet each and every element described as a common attribute. 250 S.W.3d at 820–22. One of the attributes mentioned in both *Martin* and *Payne* was an intended use for stabbing or as a weapon. 633 S.W.2d at 82, 250 S.W.3d at 820–21. Here, Defendant seized the item from Johnson's home while stating that someone was trying to kill him. Johnson did not let her children play with the replica sword because she viewed it as dangerous. A reasonable inference from this evidence was that both Defendant and Johnson recognized the replica sword as a weapon.

The evidence was sufficient to support the jury's conclusion that the replica sword was a deadly weapon because its characteristics met the criteria established for a dagger. Point one is denied.

## Point II

In addition to his now-rejected claim that the replica sword was not a deadly weapon, Defendant's second point also asserts the trial court erred in denying his motions for acquittal of and resulting sentence for ACA because the evidence was insufficient to prove that the replica sword was used "to gain entry into the building, which is essential to the crime of [ACA] when committed in a burglary setting," citing *State v. Carpenter*, 109 S.W.3d 718, 723 (Mo.App. S.D.2003), as support for the proposition that the deadly weapon at issue must be used "to effectuate an unlawful entry into a building for the purpose of committing the underlying crime therein." Defendant then claims "there was nothing in the record from which any reasonable juror could infer that the entry into the building was made with the assistance or aid of a deadly weapon" because the only evidence on this issue was "that a glass window had been broken out[.]"

The defendant in *Carpenter* was charged with first-degree burglary under section 569.160.1(3) for unlawfully entering a house to commit an assault while another (innocent) person was present inside the house. *Id.* at 721. Carpenter was carrying a rifle as he entered the house. *Id.* at 720. Carpenter argued that he could not be found guilty of ACA because there was no evidence that he used the rifle to get into the house and that such evidence was required under *State v. Dudley*, 51 S.W.3d 44, 52 (Mo.App. W.D.2001) (holding that the evidence was insufficient to prove that the gun was used to enter the house for purposes of an ACA conviction based upon second-degree burglary). *Id.* at 721–22.

The State acknowledges the holding of *Carpenter* in ACA cases where the first-degree burglary depended on a person being present in the building who was not a participant in the crime, but argues that

the rule differs if the burglary is "elevated based on the fact that the defendant was armed with a deadly weapon." The State focuses on the various enhancements for burglary instead of the elements of the basic offense of burglary. The State's position was seemingly rejected by the Western District in *Carpenter* when it stated:

> Therefore, a person commits ACA in connection with burglary not, as the State suggests, if he or she uses a dangerous instrument or deadly weapon *either* to effectuate unlawful entry to a building *or* for the purpose of committing the denominated crime therein; the crime of ACA is committed in a burglary setting if the weapon or instrument is used to *gain entry for the purpose* of committing a crime therein.

109 S.W.3d at 723 (emphasis as stated in original). It also pointed out that "[w]hat did or did not follow upon [Carpenter's] unlawful entry is wholly immaterial to a determination whether [he] committed the crime of first-degree burglary, *as it was charged here.*" *Id.* (emphasis added); *see also State v. Collins*, 188 S.W.3d 69, 75–76 (Mo.App. E.D.2006) (ACA conviction reversed when there was no proof that the gun was used to enter the apartment during the commission of a first-degree burglary); *State v. Hopkins*, 140 S.W.3d 143, 159 (Mo.App. E.D.2004) (ACA conviction reversed when no evidence was presented that the weapon, which was not recovered, was used to gain entry to the building during the commission of a first-degree burglary).

· The State attempts to distinguish *Carpenter* because the first-degree burglary charge there was based upon a subsection of section 569.160.1 that required the State to prove that "a person not associated with the criminal enterprise was present in the building during the crime" and its holding was expressly limited to cases prosecuted under that subsection (3) of 569.160.1. 109 S.W.3d at 723–24. In both *Collins* and *Hopkins,* the jury instructions for first-degree burglary also required the presence of an innocent person inside the structure during the offense. 188 S.W.3d at 75, 140 S.W.3d at 158. In the instant case, Defendant's first-degree burglary charge was based on subsection (1) of section 569.160.1, not subsection (3). Subsection (1) required the State to prove that "while in such building, [Defendant] was armed with a deadly weapon." [10] The *Carpenter* court limited its holding "to a finding that the evidence was insufficient to support a conviction of ACA arising out of first-degree burglary *as it was charged in the third amended information[,]* " 109 S.W.3d at 723 (emphasis as stated in original), and declined to decide whether it would have been sufficient for Carpenter to merely possess the weapon while remaining unlawfully in the building if the burglary had been charged in that manner.

> In its brief, the State refers to Carpenter's charge as being under subsection (3) of section 569.160, and Defendant's charge as resting on subsection (2) of the same section. The State's reference to subsection (2) appears to be in error as that subsection states: "Causes or threatens immediate physical injury to any person who is not a participant in the crime" while subsection (1) states: "Is armed with explosives or a deadly weapon[.]"

**10.** Count I of the amended information reads: The defendant[,] in violation of Section 569.160, RSMo, committed the class B felony of burglary in the first degree, punishable upon conviction under Section 558.011, RSMo, in that on or about June 21st, 2009, in the County of Phelps, State of Missouri, the defendant knowingly entered unlawfully in a building, located at [ ] and owned by Tenth Street Baptist Church, for the purpose of committing Stealing therein, and while in such building, the defendant was armed with a deadly weapon.

*Id.* at 724.[11] Although it did so limit its holding, the rationale underlying the *Carpenter* decision would not necessarily be limited to cases where the presence of an innocent person inside the structure is charged as the means of enhancing the crime from burglary-second to burglary-first.

The State cites *State v. Blackwell*, 978 S.W.2d 475, 477 (Mo.App. E.D.1998), as supporting the proposition that ACA is sufficiently proven if the Defendant was armed during the course of the burglary. In *Blackwell*, the defendant argued that the gun he was seen holding while inside the burglarized home was not actually used to aid or assist in the burglary as required for ACA. *Id.* The Eastern District stated:

> The charge of burglary in the first degree required evidence to support finding defendant entered an inhabitable structure for the purpose of committing a crime therein and "in effecting entry or while in the building or inhabitable structure or in immediate flight therefrom, he or another participant in the crime ... [was] armed with explosives or a deadly weapon." Section [5]69.160. The evidence that defendant was armed while in the building supported a finding that he was guilty of burglary in the first degree and, therefore, the same evidence supports a finding he was guilty of armed criminal action.

*Id.* at 477–78. The charge itself is not reproduced in the opinion, but it does not appear that the offense was based on the presence of an innocent person inside the home.[12] It appears from the facts discussed that stealing was the underlying crime intended as "[t]here was evidence that defendant stole the gun, later determined to be a loaded .22 semiautomatic rifle, from [the victim's] residence." *Id.* at 477.

Thus, while it seems that Defendant's first-degree burglary may be more similar to the one in *Blackwell* than those in *Carpenter* and its progeny, there is no need for us to resolve any potential conflict between these cases because even if we were to go beyond the specific holding in *Carpenter* and apply its broader underlying rationale, sufficient evidence was presented to allow a reasonable juror to conclude that Defendant used the replica sword to effectuate his entry into the church.

Johnson testified that the replica sword was not in the same condition as when Defendant took it because it was subsequently "all banged up, scratched up." Officer Davis testified that he found a screen lying *outside* on the ground near a broken basement window and "there wasn't much glass left in the windowpane at all." (Emphasis added.) Photographs of the broken window also depict that a portion of the window's frame was bent downward.[13] An examination of the replica sword reveals that its tip is dented, dulled, and scratched. A reasonable inference from this evidence is that Defendant used some-

**11.** The State attempted to amend the information in *Carpenter* so as to also charge an alternate means of committing burglary—by unlawfully remaining in a structure—but the trial court refused to permit the amendment. *Id.* at 723–24.

**12.** The allegation could have been "threaten[ing] immediate physical injury" because Blackwell pointed his gun at an officer as he ran from the home. 978 S.W.2d at 477.

**13.** The State claims that Exhibit 7, a close-up photograph of the window, shows a "puncture" mark. Our review of the photograph leaves us uncertain as to whether the referenced mark is a puncture or a tear resulting from the stress of bending or hacking at the frame.

thing other than his hands or even his kicking foot—namely, the replica sword—to avoid cutting himself while breaking away most of the glass in the window and to pry out the window screen. The jury was permitted to reject other reasonable inferences (for instance, that the replica sword was damaged only because Defendant use it to pry on the church's interior door) and our standard of review requires us to disregard any such inferences because they are unfavorable to the verdict. *Withrow*, 8 S.W.3d at 77.

Finally, Defendant argues that "the verdict director for this offense did not give the jury proper guidance to determine [Defendant's] guilt beyond a reasonable doubt." We need not address this argument as it is not presented in Defendant's point relied on and is a different argument from those raised in his first and third points. "Appellate courts review only for matters raised in the points relied on." *State v. Russell*, 872 S.W.2d 866, 872 (Mo. App. S.D.1994).

The evidence presented was sufficient to allow a reasonable juror to conclude that Defendant used the replica sword—a deadly weapon—to enter the church. Point II is denied.

### Point III

Defendant's final point asks us to review Instruction 9, the ACA verdict director, for plain error under Rule 30.20.[14] Instructional error rarely rises to the level of plain error. *State v. January*, 176 S.W.3d 187, 193–94 (Mo.App. W.D.2005). A reversal is required only when it is readily apparent that the purported error affected the jury's verdict. *Id.*

In deciding whether or not to grant plain error review, this Court must first examine whether the claim of plain error is one that, on its face, establishes substantial grounds for believing that manifest injustice or miscarriage of justice has occurred. *State v. Brown*, 902 S.W.2d 278, 284 (Mo. banc 1995), *cert. denied*, 516 U.S. 1031, 116 S.Ct. 679, 133 L.Ed.2d 527 (1995).... In the absence of an [outcome determinative error in a direct appeal], no manifest injustice or miscarriage of justice exists and the appellate court should decline to exercise its discretion to review the claim of plain error pursuant to Rule 30.20. [*Deck v. State*, 68 S.W.3d 418, 427–28 (Mo. banc 2002) ]. If this Court finds that substantial grounds exist, then we should review the claim to determine whether manifest injustice or a miscarriage of justice has actually occurred. *State v. Bozarth*, 51 S.W.3d 179, 181 (Mo.App. W.D.2001). While plain error is evident, obvious and clear error, it is clear that "not all prejudicial error—that is, reversible error—can be deemed plain error." *State v. Dowell*, 25 S.W.3d 594, 606 (Mo.App. W.D.2000); *State v. Bailey*, 839 S.W.2d 657, 661 (Mo.App. W.D.1992).

*State v. Shaffer*, 251 S.W.3d 356, 358 (Mo. App. S.D.2008).

Here, Defendant claims the use of Instruction 9 resulted in manifest injustice or miscarriage of justice because it: 1) included a definition of "dangerous instrument" when that term was not used in the instruction; 2) did not contain a definition for "deadly weapon" even though that term "was a central and disputed issue in the case"; and 3) did not include as an element of the crime that Defendant "knowingly" used a deadly weapon.

Instruction 9 stated:

---

**14.** All rule references are to Missouri Court Rules (2011). Defendant is limited to plain error review because he did not object to Instruction 9 at trial.

As to Count II, if you find and believe from the evidence beyond a reasonable doubt:

First, that defendant committed the B felony of Burglary 1st, as submitted in Instruction No. 7, and

Second, that defendant committed that offense by, with through [sic] the use, assistance, and aid of a deadly weapon,

Then you will find the defendant guilty under Count II of armed criminal action.

As used in this instruction, the term "dangerous instrument" means any instrument, article, or substance that, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

Although Defendant's first-degree burglary charge was based on a claim that he was armed with a deadly weapon, the State alleged Defendant committed ACA by the use of a dangerous instrument.[15] A person may commit ACA by using either a dangerous instrument or a deadly weapon. Section 571.015.

MAI–CR 3d 332.02.1 is the pattern instruction for ACA. Note 7 states that "dangerous instrument" must be defined if it is used in the instruction and "deadly weapon" may be defined by the trial court on its own and must be defined upon the

written request of either party. Neither party made such a written request. The pattern instruction also requires that the second element include the word "knowing" along with "use," "assistance," or "aid" to include the appropriate mental state required by section 562.021. *See* Note 2; *Williams*, 126 S.W.3d at 382.

■ Any verdict-directing instruction must contain each element of the charged offense and require the jury to find every fact necessary to satisfy that element. *State v. Doolittle*, 896 S.W.2d 27, 30 (Mo. banc 1995) (holding that the failure to require a finding that the defendant used an item in a threatening manner along with the failure to define "dangerous instrument" in a verdict director for first-degree robbery constituted plain error). Although the *Doolittle* court did find plain error, the case does not stand for the proposition that the failure to include a contested element always constitutes plain error as even a properly preserved error may be found harmless beyond a reasonable doubt. *Id.* at 30 and n. 6.

### A. Inclusion of Dangerous Instrument Definition

■ Defendant argues that including the definition of "dangerous instrument" in Instruction 9 when its second element asked them to determine whether Defendant used a "deadly weapon" "added to the confusion about what the jury was properly required to determine[ ] and what facts they should use to do so." Defendant also contends that the attorneys' ar-

---

15. Count II of the amended information alleged:

> The defendant[,] in violation of Section 571.015, RSMo, committed the felony of armed criminal action, punishable upon conviction under Section 571.015.1, RSMo, in that on or about June 21st, 2009, in the

[C]ounty of Phelps, State of Missouri, the defendant committed the felony of Burglary 1st charged in Count I, all allegations of which are incorporated herein by reference, and the defendant committed the foregoing felony of Burglary 1st by, with and through, the knowing use, assistance and aid of a dangerous instrument.

guments to the jury regarding deadly weapon and dangerous instrument added to the confusion. While the State concedes that the "discrepancies" identified by Defendant did not comply with the requirements of MAI–CR 3d and its applicable Notes on Use, *see State v. Livingston*, 801 S.W.2d 344, 348 (Mo. banc 1990), it contends that none of these "discrepancies" resulted in a manifest injustice or miscarriage of justice here in that giving a definition for "dangerous instrument" "was rendered harmless by the fact that it was entirely superfluous" and including an erroneous definition in a verdict director is not necessarily prejudicial to a defendant. *See e.g., State v. Creviston*, 735 S.W.2d 91, 94 (Mo.App. S.D.1987) (where including an unrequested, erroneous definition of sodomy was found not to have resulted in prejudice).

▪ The State's information alleged that Defendant committed ACA through the use of a dangerous instrument. Including a definition for dangerous instrument would have been mandatory if the verdict director's second element had tracked that claim. *See* MAI–CR 3d 332.02.1, Note 7.[16] But here, the verdict director varied from the information by alleging that Defendant had committed ACA by the use of a "deadly weapon." While this failure to track the information was erroneous, "a variance between the charge and proof does not require a reversal unless it is material to the merits of the case and prejudicial to the defense." *State v. Chowning*, 866 S.W.2d 165, 169 (Mo. App. S.D.1993).

In *Chowning*, the ACA instruction referred to "dangerous instrument" instead of "deadly weapon" as charged in the in-

formation. *Id.* at 168. On review, we found that Chowning was not prejudiced because he was prepared to counter the evidence and that proof of his use of either a deadly weapon or dangerous instrument resulted in the same felony classification and the same punishment. *Id.* at 169. As in *Chowning*, we find that the substitution of "deadly weapon" for "dangerous instrument" in element two of Instruction 9— along with the inclusion of a definition for "dangerous instrument"—did not result in any prejudice to Defendant. The State's contention that Defendant was fully prepared to (and did) contest the State's claim that the replica sword was a deadly weapon is supported by the record, and whether the replica sword was a deadly weapon or a dangerous instrument did not change the range of punishment for the offense.

### B. No Inclusion of Deadly Weapon Definition

▪ As earlier noted, MAI–CR 3d 332.02 did not mandate that Instruction 9 include a definition of "deadly weapon" absent a written request from one of the parties. *See* Note 7(b). Generally, a defendant cannot expect a definition to be included when the notes on use indicate that such a definition may be given but is not required. *See State v. King*, 747 S.W.2d 264, 275 (Mo.App. E.D.1988). Despite this general rule, Defendant asserts the trial court should have added the definition on its own motion here because "this was an essential element of the offense" and it may be plain error not to include a definition even if its inclusion is not mandated by MAI, citing *State v. Farris*, 125 S.W.3d 382, 394–95 (Mo.App. W.D.2004).

---

**16.** During a bench conference, the prosecutor stated a definition for dangerous instrument and then said it was "a definition mandated by the Supreme Court of Missouri, approved by the MAI and ordered to be included in this instruction[.]" Defense counsel interjected, "Actually, I agree with him 100 percent on that."

In *Farris,* the defendant requested that the definition of "possession" be included in a verdict-directing instruction for the charge of an attempt to manufacture a controlled substance. *Id.* at 389. The trial court refused to do so, and the defendant failed to preserve the claim because he did not include it in his motion for new trial. *Id.* On plain error review, the Western District held that even if a definition is not required by MAI–CR 3d, it must still be given if the substantive law requires it. *Id.* at 391. It held that the definition was required in *Farris* because the State claimed the defendant had *constructive* possession of the items, thus making his knowledge and control critical facts to be determined by the jury. *Id.* at 392 (emphasis ours). Because the definition was not given, the defendant—who contested his possession of the items—was prejudiced because the State was excused from proving an essential element of the offense and "the evidence in the case fail[ed] to establish the existence of the omitted element 'beyond serious dispute.' " *Id.* at 394 (quoting *State v. Harney,* 51 S.W.3d 519, 533–34 (Mo.App. W.D.2001)).

But *Farris* also does not stand for the proposition that the failure to give a definition required by the substantive law is *per se* prejudicial for purposes of plain error review. *See State v. Smith,* 157 S.W.3d 687, 696 (Mo.App. W.D.2004) (holding that the defendant suffered no prejudice by a verdict-directing instruction that erroneously failed to define "possession" in an attempt to manufacture a controlled substance case when the evidence was beyond serious dispute that defendant possessed the manufacturing items and the State did not improperly argue possession).

In determining whether Defendant suffered a manifest injustice or miscarriage of justice by the absence of a "deadly weapon" definition in Instruction 9, we also note that defense counsel received permission from the trial court to define deadly weapon in her closing argument to the jury.

THE COURT: I'm not convinced as a matter of law this could not be found to be a deadly weapon. I think that's an argument to take to the jury, and you can refer to what the [appellate court] has told us. I can't rule as a matter of law that that was not—

[DEFENSE COUNSEL]: Your Honor, is your ruling that I may refer to these cases [*Payne* and *Martin* ] in my argument to the jury telling them what a dagger is since there's no instruction to tell them?

THE COURT: I don't know of any reason why she could not. Does the State know of any reason why [Defense Counsel] could not?

[The prosecutor argued objections and then discussed with the trial court whether a party could argue the law to the jury. Whether a MAI model instruction should be modified was also discussed.]

THE COURT: But as far as I'm concerned, if you want to argue and correctly argue—

[DEFENSE COUNSEL]: Yes, sir.

THE COURT:—the definitions set out in case law—

[DEFENSE COUNSEL]: Yes, sir.

THE COURT:—in closing, I will allow you to do so.

[DEFENSE COUNSEL]: Thank you, sir.

THE COURT: Yes.

[THE PROSECUTOR]: What definition is she going to use?

[DEFENSE COUNSEL]: I have two different definitions. It's set out in *State vs. Payne* and *Martin,* neither of which are mutually exclusive.

[THE PROSECUTOR]: Exactly what definition are you referring to, the one where it describes eight inches?

[DEFENSE COUNSEL]: A dagger is a straight knife worn on the person capable of inflicting death. This is a[sic] not a euphemism for a pointed or short object.

Further, it is judicially recognized as, a dagger is a short weapon with a sharp point used for stabbing. Those are not mutually exclusive. I think those fall within the definition. One just clarifies the other. I don't see a problem with those.

THE COURT: I'm going to allow you to argue law. Again, as long as it's correctly stated, you may do so.

[DEFENSE COUNSEL]: I won't make up laws, sir.

THE COURT: All right.

Defense counsel then gave the jury definitions for both "deadly weapon" and "dangerous instrument" during her closing argument.

Unlike the situation in *Farris*, the lack of a definition for deadly weapon in Instruction 9 did not excuse the State from proving that the replica sword was a deadly weapon (a burden it also bore in proving the Count I first-degree burglary charge) and defense counsel was allowed to define the term in her closing argument to the jury. As a result, the trial court's failure to include a definition for deadly weapon in Instruction 9 resulted in no manifest injustice or miscarriage of justice.

### C. Omission of "Knowing"

As for the failure to include the word "knowing" in Instruction 9, the State argues that it could not have caused manifest injustice because "the knowing use of the [replica] sword was not a contested element at trial and the jury's verdict of guilty on the first-degree burglary count required the jury to find the use of a deadly weapon." We agree.

A verdict directing instruction that omits an essential element rises to the level of plain error if the evidence establishing the omitted element was seriously disputed. On the other hand, if the evidence establishing the omitted element was not in dispute, the jury's verdict would not have been affected and no plain error relief need be given.

*State v. Cooper*, 215 S.W.3d 123, 126 (Mo. banc 2007) (citation omitted).

Defendant does not argue that Defendant seriously disputed whether he purposefully or knowingly possessed the replica sword. What Defendant contested was that the replica sword could be considered a deadly weapon; he did not (and does not) claim that he did not know that he was using the replica sword. Defendant did dispute the State's claim that he used the replica sword to effectuate his entry into the church, but that is not the same thing as disputing whether any such use would have been a knowing one. *See State v. Hill*, 970 S.W.2d 868, 872 (Mo.App. W.D. 1998) (holding it was not plain error to omit "knowingly" from an instruction concerning the possession of sawed-off shotgun where the defense was not that defendant "unknowingly" possessed the illegal firearm but that he had been mistaken for its true possessor). Because there was no serious dispute about whether Defendant "knowing[ly]" possessed the replica sword, any error in failing to include "knowing" in the instruction could not have affected the verdict and thereby cannot constitute plain error. *See Cooper*, 215 S.W.3d at 126.

Defendant's third point is also denied, and the judgment and sentence of the trial court is affirmed.

BARNEY, P.J., and LYNCH, J., Concur.